# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF MARYLAND

PUBLIC EMPLOYEES FOR
ENVIRONMENTAL RESPONSIBILITY
962 Wayne Avenue, Suite 610
Silver Spring, MD 20910


*Plaintiff,*


v.


DONALD J. TRUMP, in his official capacity
as President of the United States of
America,
1600 Pennsylvania Avenue, N.W.
Washington, DC 20500,


CHARLES EZELL, in his official capacity
as Acting Director of
Office of Personnel Management,
1900 E Street, N.W.
Washington, D.C. 20415,


And

OFFICE OF PERSONNEL MANAGEMENT,
1900 E Street, N.W.
Washington, D.C. 20415


*Defendants.*

**FIRST AMENDED COMPLAINT**

**FOR DECLARATORY AND**

**INJUNCTIVE RELIEF**



Case No. 8:25-cv-00260-PX

Plaintiff Public Employees for Environmental Responsibility (PEER) hereby sues Defendants Donald J. Trump, Charles Ezell, and the Office of Personnel Management (OPM) and alleges as follows:

1.      This suit seeks injunctive and declaratory relief with respect to the Executive Order issued by President Donald J. Trump on January 20, 2025, entitled "Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce" ("the Executive Order," or "E.O.") and an OPM Memorandum on the same subject.

2.      Selecting and removing federal career employees on the basis of merit—their ability to do the jobs for which they are hired—is neither a new concept nor, until recently, a controversial one. For more than 140 years, meritocratic principles have been essential to the efficient and continuous operation of the career civil service.

3.      Before that, a "spoils system" reigned and each successive president simply filled federal jobs with political allies. Under this patronage system, positions were not filled based on qualifications or merit, and when presidential administrations changed, employees were regularly dismissed from government regardless of how well they had performed their duties. The spoils system was rife with corruption. By 1832, Senator Henry Clay called it

> a detestable system. . . And if it were to be perpetuated—if the offices, honors, and dignities of the people were to be put up to public scramble, to be decided by the result of every presidential election—our Government and institutions, becoming intolerable, would finally end in despotism.

Jay M. Shafritz et al., *Personnel Management in Government: Politics and Process* (5th ed. 2001).

4.      Congress eventually repudiated the spoils era and created the modern civil service on which this country depends and under which it has thrived. Today, civil servants

> print and mint our money, control narcotics, regulate immigration, and collect taxes and duties. They help to conserve land and revitalize land that is unproductive, bring electricity into rural homes, enforce Federal laws, and administer Social Security. They operate the atomic energy program,

> forecast the weather, and protect national parks and forests. They conduct research—in physics, electronics, meteorology, geology, metallurgy, and other scientific fields—which has far-reaching effects on the health, welfare, economy, and security of our Nation. They control our airways, standardize our weights and measures, develop flood-control measures, and perform hundreds of other services required by the American people.

U.S. Civ. Serv. Comm., Pub. Info. Off., *Biography of an Ideal: A History of the Federal Civil Service* 2 (1974).

5.      Congress' requirement of merit-based hiring and its attendant protections were initially limited to a small number of federal jobs, but the share of the federal workforce that Congress has determined should be selected on the basis of merit grew steadily, now comprising the vast majority of the country's 2.3 million federal workers. Over decades, merit-based selection and retention of employees have produced a stable and successful civil service that effectively carries out the ordinary and continuous work of the federal government and has effectuated the president's policies and Congress' programs regardless of political party.

6.      To ensure accountability to the president, new administrations appoint approximately 4,000 noncareer employees to direct their agendas' implementation. These appointees direct and work in concert with career civil servants, whose expertise, experience, and skills allow them to effectively carry out policy direction while completing the nonpartisan work of government. Without these talented career employees' expertise, presidential administrations would be significantly limited in their ability to implement their agendas, and the operations of the federal government—everything from Social Security to national parks—would grind to a halt.

7.      Now, however, the Trump administration unlawfully seeks to do just that and thereby undermine the meritocratic system Congress enacted and return to a spoils system, with all the dangers it entails.

## PARTIES

8.      Plaintiff PEER (Public Employees for Environmental Responsibility) is a non-profit, non-partisan organization headquartered in Maryland. PEER provides direct services to environmental and public health professionals, land managers, scientists, enforcement officers, and other civil servants dedicated to upholding environmental laws and values. PEER provides pro bono legal services to current and former public employees who hold government accountable to environmental ethics, compliance with environmental laws, and scientific integrity standards. PEER represents and defends federal whistleblowers, investigates and exposes improper or illegal government actions, and works to improve laws and regulations impacting PEER's clients.

9.      Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

10.      Defendant Office of Personnel Management (OPM) is a federal agency that serves as the chief human resources agency and personnel policy manager for the Federal government.

11.      Defendant Charles Ezell is the Acting Director of OPM. He is sued in his official capacity.

## JURISDICTION AND VENUE

12.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et. seq* and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*

13.      Venue properly lies within the District of Maryland because Plaintiff resides in this judicial district. 28 U.S.C. § 1391(e)(1).

## BACKGROUND

### The Transition from the Spoils System to a Modern, Professional Civil Service

14.      Since 1870, Congress and the presidents have consistently sought to ensure that selection and retention of federal career civil servants are based on merit, and isolated from the risk of undue partisan influence. These efforts grew out of the failures and corruption of the spoils system, and have all been directed at the improvement and professionalization of the civil service for the benefit of the government and the nation.

15.      In 1870, President Ulysses S. Grant asked Congress to undertake "a reform in the civil service of the country," recognizing that the spoils system "does not secure the best men, and often not even fit men, for public place. The elevation and purification of the civil service of the Government will be hailed with approval by the whole people of the United States."  Ulysses S. Grant, *Second Annual Message* (Dec. 5, 1870).

16.      Congress obliged, authorizing the formation of a commission to study rules and regulations concerning civil service hiring that would "best promote the efficiency" of the civil service. George William Curtis, U.S. Civ. Serv. Comm., *The Reform of the Civil Service: A Report to the President*, U.S. Gov't Printing Off. 5 (1871).

17.      The commission concluded that, under the prevailing spoils system, "both selection and removal are largely determined, not by the welfare of the service, but by political stress and exigency." *Id.* at 16.

18.      The inevitable result of such a system was that civil servants of the time were generally *not* the best people for their jobs. Indeed, "[t]he doctrine of rotation in office implies that merit should not be considered." *Id.* at 17.

19.     Nor did the damage end there. Besides suffering from an inferior workforce, government was derailed by staff turnover following each administration change. *Id.* at 6.

20.     To protect career Federal employees from undue partisan influence and ensure that the public would benefit from a professional and competent civil service regardless of political affiliation, civil service advocates and then Congress sought to establish a federal nonpartisan career civil service selected on the basis of merit rather than political affiliation. The reform movement culminated in 1883 when Congress passed the Pendleton Civil Service Reform Act. The Pendleton Act established merit-based hiring for federal positions "as nearly as the conditions of good administration will warrant," 22 Stat. 403 (Jan. 16, 1883), and provided some employment protections to employees hired in those positions.

21.     In 1897, President William McKinley issued Executive Order 101, mandating that "[n]o removal shall be made from any position subject to competitive examination except for just cause and upon written charges filed with the head of the Department, or other appointing officer, and of which the accused shall have full notice and an opportunity to make defense."

22.     Congress subsequently codified similar protections in 1912's Lloyd-La Follette Act, prohibiting removal of employees in the "classified [i.e., competitive] civil service" "except for such cause as will promote the efficiency of said service," and mandating an opportunity for an employee to respond to the basis for removal. *See* 37 Stat. 555 (Aug. 24, 1912).

23.     The Lloyd-La Follette Act was motivated, in part, by an effort to "do away with the discontent and suspicion which now exists among [civil service] employees and . . . restore that confidence which is necessary to get the best results from the employees." 48 Cong. Rec. 4654 (1912) (remarks of Rep. Calder).

24.     As time went on, Congress continued to bolster civil service protections. In 1944, Congress passed the Veterans' Preference Act, providing additional procedural protections to veterans serving in the civil service.

25.     In 1962, President John F. Kennedy issued Executive Order 10988, extending Veterans' Preference Act rights and protections to non-veteran competitive service employees.

26.     Despite these advances in civil service protections, the Nixon administration undertook a "concerted and concealed endeavor 'to politicize' the executive branch," *Senate Aides See Bureaucracy Use For Political Gain*, N.Y. Times (June 8, 1974), and to populate the government with loyalists. U.S. Cong., Subcomm. on Manpower & Civ. Serv., *Final Report on Violations and Abuses of Merit Principles in Federal Employment, Together with Minority Views*, at 147 (Dec. 30, 1976).

27.     As part of that effort, Nixon's White House Personnel Office sought to gain greater "accountability" throughout the executive branch, including by "reorganiz[ing] sections of an agency and, in doing so, eliminate the jobs of" employees the administration wanted to purge. *Id.*

28.     Whistleblowers at the Senate Watergate hearings later showed that the Nixon Administration tried to implement the "Malek Manual," a secret blueprint to replace the civil service merit system with a political hiring scheme that would have begun by purging all Democrats from federal employment. *See* Joseph D. Gebhardt et al., *Blueprint for Civil Service Reform*, *Fund for Constitutional Government* (1976).

29.     Following Nixon's resignation, President Gerald R. Ford reaffirmed the importance of the federal civil service and the merit principles that underpin it. President Ford wrote to department and agency heads that the federal government's ability "to function and move ahead even under the most difficult circumstances . . . is due chiefly to more than two million career civil

servants who, day-in and day-out, give of themselves in a thoroughly dedicated and efficient manner." Gerald R. Ford, *Memorandum on the Career Civil Service* (Sep. 20, 1974).

30.     He instructed agency heads "to see to it that the merit principles contained in the [Pendleton] Act and the personnel laws and regulations are fully and effectively carried out." *Id.*

## The Creation of a Comprehensive Merit-Based Civil Service System

31.     President Jimmy Carter proposed a "comprehensive program to reform the Federal Civil Service system." Jimmy Carter, *Federal Civil Service Reform Message to the Congress* (Mar. 2, 1978).

32.     In response, Congress recognized that federal employment "consistent with merit system principles and free from prohibited personnel practices" would best "provide the people of the United States with a competent, honest, and productive Federal work force reflective of the Nation's diversity" and enacted the Civil Service Reform Act of 1978 ("CSRA"). 92 Stat. 1111-12. The CSRA "comprehensively overhauled the civil service system," *Lindahl v. OPM*, 470 U.S. 768, 773 (1985), strengthening civil service protections in the process.

33.     The CSRA's comprehensive "new framework," *id.* at 774, protected career federal employees from undue partisan political influence, and extended adverse action rights to a larger cohort of employees, so that the business of government could be carried out efficiently and effectively, in compliance with the law, and in a manner that encourages individuals to apply to participate in the civil service. It is the principal foundation of the modern merit system.

34.     The CSRA provides that "[f]ederal personnel management should be implemented consistent with [nine] merit system principles." 5 U.S.C. § 2301(b).

35.     The CSRA's merit system principles apply to all executive agencies, and include: a) "All employees and applicants for employment should receive fair and equitable treatment"

without regard to a range of personal characteristics, including political affiliation; b) "The Federal work force should be used efficiently and effectively;" c) "Employees should be retained on the basis of the adequacy of their performance, inadequate performance should be corrected, and employees should be separated who cannot or will not improve their performance to meet required standards;" and d) Employees should be "protected against arbitrary action, personal favoritism, or coercion for partisan political purposes." *See* 5 U.S.C. §§ 2301(a), (b)(1)-(8).

36.     Giving teeth to these principles, Congress barred federal employees from engaging in certain prohibited personnel practices in the civil service, including: a) discriminating "for or against any employee or applicant for employment . . . on the basis of . . . political affiliation;" b) coercing "the political activity of any person" or taking "any action against any employee or applicant for employment as a reprisal for the refusal of any person to engage in such political activity;" c) retaliating against lawful disclosure of information that an employee reasonably believed evinces "any violation of any law, rule, or regulation," or "gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety" (whistleblowing); and d) discriminating "for or against any employee or applicant for employment on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others."  5 U.S.C. §§ 2302(b)(1)-(12).

37.     In addition to the codification of the merit system principles and the enumeration of the prohibited personnel practices, the CSRA created a "'new framework for evaluating adverse personnel actions against'" federal employees. *United States v. Fausto*, 484 U.S. 439, 443 (U.S. 1988) (quoting *Lindahl*, 470 U.S. at 774).

38.     That framework includes rights and procedures by which civil service employees may challenge adverse actions, including those resulting from prohibited personnel practices.

39.      In the 142 years since the Pendleton Act, Congress has further modified the selection criteria and the specific protections available to members of the civil service, including via the Civil Service Due Process Amendments Act of 1990, which, among other things, extended appeal rights to many excepted service employees. Pub. L. 101-376, 104 Stat. 461.

40.      Throughout these enactments, the basic principles of the federal civil service have remained the same: career civil servants are selected on the basis of merit and are not removed simply on account of their political views or those of the president.

### The Civil Service Today

#### Classifications of Employees

41.      Federal law generally classifies civil service employees into three categories – the competitive service, the excepted service, and the Senior Executive Service ("SES"), each with distinct selection, compensation, and adverse action rights. *See generally* Cong. Rsch. Serv., *Categories of Federal Civil Service Employment: A Snapshot* (March 26, 2019), https://tinyurl.com/akrc8hs6 ("CRS Categories").

42.      Roughly 70% of all federal workers are in the competitive service. *Id.* at 4.

43.      Congress made the competitive service the default for civil service employees in the executive branch; all federal employees are presumed part of the competitive service unless specifically excluded. *See* 5 U.S.C. §§ 2102(a)(1), 2103; 5 C.F.R. pts. 213, 302; Upholding Civil Service Protections and Merit System Principles, 89 Fed. Reg. 24982-01, 24988 (April 9, 2024) ("OPM Final Rule" or "Final Rule").

44.      By statute, the president possesses authority to exclude employees from the competitive service under specific circumstances. The president is permitted to "prescribe rules

governing the competitive service," but may make only "necessary exceptions of positions from the competitive service" when warranted by "conditions of good administration." 5 U.S.C. § 3302.

45.     Prior to the E.O., there were five categories of positions, or schedules, excepted from the competitive service: Schedules A-E. 5 C.F.R. § 6.2. Schedules A, B, and D provide an exception for positions where it is "not practicable" or "impracticable" to impose a hiring condition. 5 C.F.R. § 6.2. Schedules C and E are for the special and limited categories of political appointees and administrative law judges. *See, e.g.*, 5 C.F.R. §§ 6.2, 734.104.

**Civil Service Protections**

46.     Hiring into the competitive service is conducted by examinations, which are designed to be "practical in character and relate to matters that fairly test the relative capacity and fitness of the applicants for the appointment sought." CRS Categories at 2 (internal quotations omitted). *See also* 5 U.S.C. § 3304; 5 C.F.R. § 332.101.

47.     Employees in the competitive service may be subjected to adverse personnel actions only for good cause, where the adverse action will promote "the efficiency of the service." 5 §§ U.S.C. 7503(a), 7513(a). *See also* 5 C.F.R. §§ 752.102(a), 752.202(a).

48.     For minor adverse actions, competitive service employees who have completed probationary periods have notice and appeal rights and receive written notice with the reason for the action, a reasonable time to respond, and a written decision. *See* 5 U.S.C. § 7503(b).

49.     For more significant adverse actions, such as termination, reduction in pay or grade, or long suspensions, employees may also appeal to the Merit Systems Protection Board ("MSPB"). *See* 5 U.S.C. § 7513. Employees may appeal MSPB decisions to federal court. *See* 5 U.S.C. §§ 7513(d), 7701-7703.

50.    The MSPB will not sustain an adverse employment action that is unsupported by a sufficient evidentiary basis, 5 U.S.C. § 7701(c)(1), is not accordance with law, or is based on a "prohibited personnel practice." 5 U.S.C. § 7701(c)(2).

51.    Prohibited personnel actions include discrimination on the basis of political affiliation or activity, granting any preference "not authorized by law, rule, or regulation" to an employee or applicant, discrimination "on the basis of conduct which does not adversely affect" performance, or any other personnel action, "if the taking or failure to take such action violates … the merit system principles," including whistleblower protections. 5 U.S.C. § 2302(b). Under 5 U.S.C. § 7515, supervisors are subject to penalties for retaliation against whistleblowers.

52.    Hiring works differently for the excepted service, and applicants for excepted positions are not subject to an examination process. But excepted service applicants are considered "solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity." 5 U.S.C. § 2301(b)(1). *See also* 5 U.S.C. § 3320.

53.    In general, excepted service employees have the same notice and appeal rights for adverse personnel actions, though they typically must satisfy longer durational requirements before they become entitled to these rights. *See* CRS Categories at 5; 5 U.S.C. § 7511(a)(1).

54.    As with the competitive service, members of the excepted service who meet the requisite durational requirements may only be terminated for cause. *See* 5 U.S.C. §§ 7503(a), 7513(a); 5 C.F.R. § 752.102(a); 5 C.F.R. § 752.202(a).

55.    An excepted service member in a "covered position" likewise has protections against "prohibited personnel practices" like discrimination on the basis of political affiliation. *See* OPM Final Rule, 89 Fed. Reg. at 24987-88; 5 U.S.C. §§ 2302(a)-(b).

56.     The vast majority of federal workers, whether in the competitive or excepted service, are entitled to the robust protections outlined above once they have been in service for a period of 1 or 2 years and are beyond any probationary period.

### Civil Service by the Numbers

57.     The modern federal workforce consists of approximately two million civilian employees, nearly 30% of which are veterans. *See* Elizabeth Byers & Kennedy Teel, *A Profile of the 2023 Federal Workforce,* P'ship for Pub. Serv. (2024), https://tinyurl.com/bddbn8mz.

58.     Roughly 20% of the federal workforce is located inside the Washington, D.C. metropolitan area, with the rest of the federal civilian workforce spread across all fifty states. For example, 5.7% of the federal civilian workforce, or more than 110,000 employees, are located in Texas; 4.2% (or more than 84,000) in Florida; 6.6% (or more than 131,000) in California. *Id.*

59.     Public sector jobs have long been a source of opportunity and security that help individuals and families, particularly from historically marginalized groups, build economic security and move into the middle class. *See*, *e.g.*, Michael Madowitz et al., *Public Work Provides Economic Security for Black Families and Communities*, Ctr. for Am. Progress (2020), https://tinyurl.com/5fuuncfx.

### ALLEGATIONS

### The Challenged Actions Upend Longstanding Law and Practice

60.     The Challenged Executive Order and OPM Memorandum run contrary to the core principles of the federal civil service established by Congress.

### President Trump Has Previously Attempted to Politicize the Civil Service

61.     This is not the first time that a Trump Administration has attempted to gut civil service protections from the career workforce.

62.     On October 21, 2020, President Trump issued Executive Order No. 13957, "Creating Schedule F in the Excepted Service," excepting from the competitive service "positions of a confidential, policy-determining, policy-making, or policy-advocating character not normally subject to change as a result of a Presidential transition." 85 Fed. Reg. 67631, 67632 (Oct. 26, 2020).

63.     Executive Order No. 13957 included a bald assertion that "conditions of good administration," specifically "the need to provide agency heads with additional flexibility to assess prospective appointees without the limitations imposed by competitive service procedures," made the creation of Schedule F necessary. 85 Fed. Reg. at 67631.

64.     Executive Order No. 13957 further asserted that conditions of good administration made it necessary to except Schedule F positions from certain adverse action protections. In other words, Schedule F sought to radically alter federal hiring and firing of career civil servants in a manner at odds with the CSRA and its amendments.

65.     Because the first Trump Administration ended shortly after Executive Order No. 14003 was signed, no position in the federal civil service was ever moved to Schedule F. The Trump Administration's Office of Management and Budget, however, provided a preview of what was expected, designating 68 percent of its employees as Schedule F, including lower-level GS-9 and 10 positions. U.S. Gov't. Accountability Off., GAO-22-105504, *Agency Responses and Perspectives on Former Executive Order to Create a New Schedule F Category of Federal Positions*, at 14, 19 n.14 (2022), https://tinyurl.com/ycxbj56d.

66.     On January 22, 2021, President Biden issued Executive Order No. 14003, Protecting the Federal Workforce, revoking Executive Order No. 13957. 86 Fed. Reg. 7231 (Jan. 22, 2021).

67.     Executive Order No. 14003 determined that the creation of Schedule F "not only was unnecessary to the conditions of good administration, but also undermined the foundations of the civil service and its merit systems principles." 86 Fed. Reg. at 7231.

**The Executive Order and OPM Memorandum Discard Protections Requested by Previous Executives, Enacted by Congress, and Accepted by All Three Branches of Government**

68.     The E.O. and OPM Memorandum will, in effect, reinstate a spoils system, untethered from merit.

69.     The E.O. purports to amend 5 C.F.R. § 6.2 to create a new, broad category: "Career positions of a confidential, policy-determining, policy-making, or policy-advocating character not normally subject to change as a result of a Presidential transition." Amended E.O. § 4.  (Citations to the "Amended E.O." are to the integrated E.O. from the first and second Trump administrations. (Letter from Charles Ezell, Acting Dir., U.S. Off. Of Pers. Mgmt., to Heads & Acting Heads of Departments & Agencies (Jan. 27, 2025) Guidance on Implementing President Trump's Executive Order titled, *"Restoring Accountability To Policy-Influencing Positions Within the Federal Workforce"*))

70.     The purpose of this broad, new category of Schedule Policy/Career ("renewed Schedule F") is plain from the text of the E.O. – it will make it easier to fire career civil servants by excepting them from the protections that Congress afforded. *See* Amended E.O. § 1.

71.     Under the terms of the E.O., these career civil servants would, if terminated, no longer have the right to receive notice or any reason at all as to why they are being terminated, and would no longer be provided an opportunity to be heard or to appeal their termination.

72.    The workers subject to reclassification under the E.O. were chosen on the basis of merit but will now face the specter of demotion, disciplinary actions, or dismissal on the basis of political allegiance or for other improper reasons.

73.    Disciplinary actions or dismissals of employees for ideological or political loyalty reasons will deprive the federal government of experienced, expert workers and undermine the efficient administration of government operations.

74.    The CSRA already provides for well-established and robust processes to remove federal employees who are insubordinate, perform poorly, or commit serious misconduct. *See* 5 U.S.C. §§ 4303; 7511-15; 5 C.F.R. part 432; 5 C.F.R. part 752.

75.    These provisions already allow removal of employees who resist or undermine policies and directives of political leadership. Nor does the E.O. seek to remove procedural protections based on poor performance or failure to enact policy directives; it instead solely seeks to streamline terminations based on the type of work performed, and does not require any showing of poor performance, misconduct, or insubordination. But an employee's work portfolio – including whether they work on policy – has nothing to do with their performance or conduct.

76.    Indeed, the E.O. purports to exclude affected workers from the purview of chapter 23, which prohibits officials from, *inter alia*, making personnel recommendations based on political connections or influence, coercing employees into engaging in political activities, engaging in nepotism, or retaliating against whistleblowers. *See* 5 U.S.C. § 2302(b).

77.    The E.O. directs agencies to establish rules similar to those in Chapter 23 regarding prohibited personnel practices, Amended E.O. § 6, but provides no timeline for agencies to do so, nor any recourse for employees denied such protections. And since the Executive Order permits

15

agencies to terminate renewed Schedule F employees without providing any basis, agencies are effectively free to fire workers for prohibited reasons – they just need not give any reason at all.

78.    Congress provided that workers should not be subject to discipline for "refusing to obey an order that would require the individual to violate a law, rule, or regulation." 5 U.S.C. § 2302(b)(9)(D). But far from recognizing employees' ultimate obligation to uphold the rule of law, the E.O. instead threatens employees with dismissal for failing to "faithfully implement administration policies to the best of their ability." Amended E.O. § 6(b).

79.    This *carte blanche* to fire federal employees defies congressional mandates, leaving "innumerable ways for politics to factor into these traditionally merit-based decisions in a manner that would be difficult to detect or remedy." 89 Fed. Reg. at 24994.

80.    At the same time, the E.O. purports to remove competitive hiring processes which ensure that positions are filled by merit. *See* Amended E.O. §§ 1, 4.

81.    On January 27, 2025, OPM Acting Director Charles Ezell issued a Memorandum to heads and acting heads of departments and agencies.

82.    The OPM Memorandum provides that "career positions will be rescheduled into Schedule Policy/Career and thereby exempted from the adverse action procedures set forth in chapter 75 of title 5 of the United States Code." OPM Mem. at 1.

83.    The Memorandum further provides guidance to agencies about what positions should be included in renewed Schedule F but emphasizes that this guidance is "not determinative." *Id.* at 2-3. Instead, agencies are encouraged to include positions "based on additional characteristics not expressly specified" in the Executive order or OPM Memorandum. *Id.* at 4.

16

84.     The OPM Memorandum directs agencies to identify positions to be transferred to renewed Schedule F and to submit their initial "petitions to reschedule positions" to renewed Schedule F "no later than Sunday, April 20, 2025," encourages agencies to provide such submissions "on a rolling basis before this date," and explains that agencies will have an additional period to finalize and "submit any remaining petitions." *Id.* at 4-5.

85.     OPM explained that a new Executive Order will "effectuate the transfers" of positions to renewed Schedule F. *Id.* at 4.

86.     Just one day after issuing this Memorandum, OPM sent an email to virtually all federal employees confirming that the Administration intended to use the at-will employment status achieved by renewed Schedule F as a tool to "downsize[]" "a substantial number of federal employees." Letter from U.S. Off. Of Pers. Mgmt. to Federal Employees (Jan. 28, 2025), *Deferred Resignation Email to Federal Employees,* https://tinyurl.com/ycnpv2ee.

87.     In short, the E.O. and OPM Memorandum abrogate protections that Congress created to protect against partisan encroachment into hiring and firing decisions.

**Renewed Schedule F Is Not Warranted by Good Administration**

88.     The E.O. asserts that the removal of civil service protections is necessary and warranted by good administration as required by 5 U.S.C. § 3302, but the opposite is true.

**Prior Government Actions Reflect that Only Narrow Exceptions to the Competitive Service are Necessary to Promote Good Administration**

89.     Prior determinations to except narrowly-defined groups from the competitive service demonstrate that renewed Schedule F is an aberration—it is neither necessary nor warranted by good administration. In prior exceptions to the competitive service, the president or OPM carefully considered the necessity of such exceptions, tailoring new schedules and

exceptions to the specific factual circumstances that required deviating from the default of competitive service.

90.     For example, in 2009, OPM conducted a review of the government's ability to recruit and hire students and recent graduates. This review included an interagency team to examine relevant federal recruiting and hiring processes, public hearing and invitation for comments on the necessity for an exception to competitive service, review of scholarly literature and empirical data, expert analysis, and a report from OPM to the president. *See generally* Excepted Service, Career and Career-Conditional Employment; and Pathways Programs, 76 Fed. Reg. 47495, 47496-97 (Aug. 5, 2011) (describing review).

91.     President Obama subsequently issued Executive Order No. 13562, creating Schedule D, which excepted certain students and recent graduates temporarily from the competitive service. Relying on OPM's report, the President articulated the necessity of these new exceptions in light of identified barriers to employment, the benefits recent graduates provide to the federal workforce, and the merit system principle set forth in 5 U.S.C. § 2301(b)(1) for the federal government "to achieve a work force from all segments of society." *See* Executive Order No. 13562, 75 Fed. Reg. 82,585 (Dec. 30, 2010).

92.     Other competitive service exceptions were tied to specific and narrow factual circumstances that made deviating from competitive service necessary.

93.     In 2023, OPM engaged in notice-and-comment rulemaking to decide how best to "enhance the efficiency of the Federal civil service and promote good administration." Upholding Civil Service Protections and Merit System Principles, 88 Fed. Reg. 63862-01 (Sept. 18, 2023).

94.     As part of this process, OPM received and reviewed extensive submissions, including by Plaintiff. More than 4,000 commenters weighed in, including from "a variety of

individuals (including current and former civil servants), organizations, and Federal agencies." OPM Final Rule, 89 Fed. Reg. at 24984.

95.     In addition to carefully considering these comments, OPM reviewed scholarly literature and empirical studies, analyzed the history of the civil service, and examined Congress' frequent statutory actions in this space. *See generally id.*

96.     Following this comprehensive process, OPM concluded that strengthening and clarifying civil service protections—not removing them, as proposed by the E.O.—would promote good administration.

97.     For example, the Final Rule cataloged existing and effective mechanisms for "appropriate management oversight" of employees. 89 Fed. Reg. at 24990; *id.* at 24995-96.

98.     The Rule also evaluated empirical studies and literature relating to state and international efforts to remove civil service protections, concluding that removing civil service protections did not improve performance or the delivery of government services. *See* 89 Fed. Reg. at 24998, 25002-03. The Rule concluded that instead of ensuring accountability and effective government, the evidence confirmed that Schedule F would open the door to partisan hiring and firing that risks ushering in the return of the spoils system that Congress has long sought to stamp out. Civil service protections are strongly associated with better government administration, including improved government performance, more effective delivery of services, and reduced corruption. *Id.* at 25002-05. Excepting such workers from the competitive service would "inject[] politicization into the nonpartisan career civil service" and "would not only harm government employees, agencies, and services, but also the American people that rely on them." *Id.* at 24995.

**Social Science Confirms that the Merit Protections and Procedural Safeguards Targeted by the Executive Order Promote Government Performance**

99.    Extensive social science research confirms that renewed Schedule F is neither necessary nor warranted by good government administration.

100.    For example, a meta-analysis looking at the impact of merit principles examined nearly 100 peer-reviewed studies across more than 150 countries. The analysis showed that use of merit principles and tenure protection for civil servants was positively and consistently associated with government performance and negatively associated with corruption. *See* Eloy Oliveira et al., *What Does the Evidence Tell us about Merit Principles and Government Performance?*, 102 Pub. Admin. 668, 683 (2023), https://tinyurl.com/2xcpf7x9.

101.    Other studies confirm the importance of civil service protections for the effective delivery of government services, including that adopting civil service reforms reduced errors and increased productivity. *See* Abhay Aneja & Guo Xu, *Strengthening State Capacity: Civil Service Reform and Public Sector Performance during the Gilded Age*, 114 Am. Econ. Rev. 2352 (2023), https://tinyurl.com/mn8jcnu4.

102.    Social science research confirms reduced merit protections drive experts out of government and make it harder to recruit motivated, effective workers. *See* Mark D. Richardson, *Politicization and Expertise: Exit, Effort, and Investment*, 81 J. Pol., 878-891 (2019).

**History Reflects that Renewed Schedule F is Neither Necessary Nor Warranted by Conditions of Good Administration**

103.    Since 1883, career civil servants have conducted the business of government for the American people in a non-partisan manner.

104.    They have advised incoming administrations regardless of party affiliation, carried out presidential priorities and Congress' programs, all while ensuring the timely delivery of public benefits to the countless Americans who depend on them.

105.    This was as true under President Trump as it was for his predecessors.

106.    If this E.O. and the OPM Memorandum stand, future administrations are unlikely to retain employees chosen on the basis of political loyalty to a predecessor and will likely seek to replace them. "[W]hen a man has not been appointed by reason of his fitness, he must not ask that he be retained on account of his merit. . . . It treats the public service as a huge soup-house, in which needy citizens are to take turns at the table, and they must not grumble when they are told to move on." *The Reform of the Civil Service*, 17.

107.    The E.O. and OPM Memorandum will resurrect quadrennial "public scrambles" for appointment to a vast swath of federal posts, undermining government efficiency at times of presidential transition.

### The Executive Order and OPM Memorandum Dramatically Expand Congress' Narrow Exclusions From Civil Service Protections

108.    Congress has crafted narrow exclusions from civil service protections for limited categories of employees, including those who are Senate confirmed; whose positions are "of a confidential, policy-determining, policy-making or policy-advocating character" (who are listed on Schedule C); were appointed directly by the president; members of the Foreign Service, the Central Intelligence Agency and several other specifically identified agencies; non-citizens who occupy positions outside of the United States; and some retired annuitants. 5 U.S.C. §§ 7511(b)(1)-(10). *See also* 5 U.S.C. § 2302(a)(2)(B).

109.    Since the CSRA was enacted in 1978, administrations have limited Schedule C exceptions to fewer than 2,000 employees, less than 0.1 percent of the federal workforce. *See* U.S. Civ. Serv. Comm'n, *Maintaining the Integrity of the Career Civil Service*, 10 (1960); U.S. Off. Of Pers. Mgmt., *General, Questions and Answers*, https://tinyurl.com/y8wtp9yk (last visited Jan. 16, 2025) (detailing different political appointment types); Ctr. for Presidential Transition, *Frequently*

*Asked Questions About the Political Appointment Process*, P'ship for Pub. Serv., https://tinyurl.com/ycyph42y (last accessed Jan. 16, 2025).

110.    Just 0.02% of the federal workforce, roughly 4,000 people, serve as political appointees, including Senate-confirmed, presidentially appointed, and Schedule C officials.

111.    The exception for employees whose positions are "of a confidential, policy-determining, policy-making or policy-advocating character" in 5 U.S.C. § 7511(b)(2) and 5 U.S.C. § 2302(a)(2)(B) is limited to employees who do not have an expectation of continued employment after the presidential administration in which they serve. *See, e.g.*, 5 U.S.C. § 9803(c)(2)(A); 6 U.S.C. § 349(d)(3)(B); 7 U.S.C. § 6992(e)(2)(D); 38 U.S.C. § 725(c)(1).

112.    Congress has also used the phrase "confidential, policy-determining, policy-making or policy-advocating character" ways that only makes sense in the context of non-career (e.g., political) employees, including to exclude appointees from bonuses or other programs designed for the benefit of the career workforce. *See, e.g.*, 5 U.S.C. §§4107(b)(3)(B) (excluded from payments for academic degree training), 5379(a)(2) (excluded from student loan repayments), 5402(2)(vi) (excluded from bonus); 5 U.S.C. § 3372(a)(1) (excluded from local government exchange programs).

113.    Were positions "of a confidential, policy-determining, policy-making or policy-advocating character" expanded to include career employees, it would undercut the CSRA, which establishes protections for both competitive and excepted service employees.

114.    Yet that is exactly what the E.O. and OPM Memorandum seek to do, including for entry-level and mid-level employees. Based on the actions of agencies in the first administration of President Trump and statements from OPM during this administration that agencies are likely to reclassify to at-will status "a substantial number of federal employees," entry-level and mid-

level employees such as GS-9 and GS-10 employees will be classified as excepted from the competitive service under renewed Schedule F.

**The Executive Order and OPM Memorandum are Aimed at Politicizing the Civil Service, and Any Claimed Benefits to Good Administration are Pretext**

115. President Trump and his surrogates have made clear that renewed Schedule F, far from being a tool to drive effective government and improve performance, is based on a desire to drive out career civil servants, including those who may not share his politics, and to expedite the process of hiring political loyalists into positions previously staffed on the basis of merit.

116. President Trump stated that he seeks to make "every executive branch employee fireable by the president of the United States. The deep state must and will be brought to heel." Donald J. Trump, Speech at Political Rally in Florence, South Carolina (March 12, 2022), https://tinyurl.com/3k6km35w.

117. The President has pledged to fire wide swaths of civil servants, promising to "throw off the political class that hates our country." Donald J. Trump, Speech at Conservative Political Action Conference (March 4, 2023), https://tinyurl.com/2hjrs5ah. As he explained, "you'll see that on the first day of my presidency, the deep state which is destroying our nation. The tables will turn and we will destroy the deep state. We're going to destroy the deep state." Donald J. Trump, Speech at South Carolina GOP Dinner (Aug. 5, 2023), https://tinyurl.com/36uhbe74.

118. President Trump has singled out Democrats and so-called "RINOs" (Republicans In Name Only) for termination. For example, in one video post from May 2023, Trump told a reporter that he will make "very big changes" to the FBI in a potential second term. Donald J. Trump (@realDonaldTrump), Truth Social (May 15, 2023, 11:04 PM ET), https://tinyurl.com/bdesuz3w. The DOJ and FBI, Trump said, personify the "deep state" as they are filled with "thousands and thousands" of "RINOs and with Democrats" that have been there

for decades. Rebecca Jacobs, *Trump Has Said He Wants to Destroy the "Deep State" 56 Times On Truth Social*, CREW (Aug. 1, 2024), https://tinyurl.com/36z27phm. In another speech, he criticized the "deep state" workers who "work with the with the Democrats and the Republicans, and those are the Republicans I don't like." Donald Trump, Speech at Political Rally in Sarasota, Florida (July 3, 2021), https://tinyurl.com/58r46v4a.

119.    Indeed, on the same day that he issued the Executive Order, President Trump declared his desire to fire career civil servants that had been hired by the Biden Administration, stating that "[m]ost of those bureaucrats are being fired – they're gone. It should be all of them." Erich Wagner, "*Trump: Agencies Should Fire 'All' Bureaucrats*," Government Executive (Jan. 20, 2025),                https://www.govexec.com/workforce/2025/01/trump-agencies-should-fire-allbureaucrats/402353/. As he signed the Executive Order, President Trump reiterated that he was "getting rid of all the cancer, the cancer caused by the Biden administration." Alan Rappeport*, "Federal Employees Union Sues Trump Over Worker Protections*," New York Times (Jan. 21, 2025), https://www.nytimes.com/2025/01/21/us/politics/trump-schedule ffederal- workers.html.

120.    Vice President Vance reiterated that President Trump should "[f]ire every single midlevel bureaucrat, every civil servant in the administrative state, replace them with our people." Andrew Prokop, *J.D. Vance's Radical Plan to Build a Government of Trump Loyalists*, Vox (July 18, 2024), https://tinyurl.com/4rsvn7xv.

### The President and OPM Lack Authority to Strip Procedural Protections from Civil Servants Without Due Process

121.    The E.O. and OPM Memorandum purport to strip due process protections from current career civil servants, allowing employees placed onto renewed Schedule F to be fired at will and without procedural protections such as notice and an opportunity to be heard.

122.     But once federal employees obtain tenure protections, they retain them—even if their positions are reclassified into positions no longer eligible for those protections, as the Constitution prohibits the government from stripping that interest without due process of law. *See Cleveland Bd. of Educ. v. Loudermill*, 70 U.S. 532, 541 (1985); U.S. Const. amend. V.

123.     Here, Congress created conditions under which excepted and competitive service employees with the requisite satisfactory tenure earn a property interest in that continued employment. For such employees, Congress has mandated that removal and the other actions described in title 5 may be taken only "for such cause as will promote the efficiency of the service." *See* 5 U.S.C. §§ 7503(a), 7513(a); 5 C.F.R. §§ 752.102(a), 752.202(a).

124.     This property interest in continued employment has existed in the civil service since at least 1912, when the Lloyd-La Follette Act required just cause to remove a federal employee. *See Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 576-77 (1972); 89 Fed. Reg. at 24987.

125.     The Constitution divests the president of authority to terminate employees' accrued property interests in continued employment, and their concomitant due process protections, simply by converting them from one federal civil service category to another. *See Roth v. Brownell*, 215 F.2d 500, 502 (D.C. Cir. 1954). "Neither the formula of 'excepting' the kind of position a person holds, nor any other formula, can obviate the requirements" for firing a civil servant. *Id.*

### <u>The Executive Order and OPM Memorandum Disregard Foundational Tenets of Administrative Law and Would Require Agencies to Violate the Administrative Procedure Act</u>

126.     The E.O. and OPM Memorandum purport to simply disregard prior legal restraints against its implementation by nullifying regulations enacted pursuant to the Administrative Procedure Act following notice and comment.

25

127.     Specifically, the E.O. provides that 5 C.F.R. part 302 and 5 C.F.R. § 210.102(b)(3) and (4) "shall be held inoperative and without effect" until OPM rescinds all portions of the Final Rule which would interfere with the E.O. January 20, 2025 E.O. § 4.

128.     Likewise, the OPM Memorandum directs agencies to "disregard" provisions of the OPM Rule. OPM Mem. at 4-5.

129.     This circumvents Congress' requirement in the Administrative Procedure Act that rulemakings and resulting regulations be promulgated, delayed, or rescinded through procedures designed "(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005).

130.     Congress expressly subjected OPM to the rulemaking requirements of the Administrative Procedure Act. *See* 5 U.S.C. §§ 553, 1103(b)(1), 1105; *see also* 5 C.F.R. § 110.101.

131.     As described above, pursuant to its statutory authority, OPM previously engaged in comprehensive notice-and-comment rulemaking that implicated many issues relevant to the E.O. and ultimately issued final regulations that became effective on May 9, 2024.

132.     The May 9, 2024 OPM regulations are "legislative" because they were adopted "pursuant to properly delegated authority, ha[d] the force of law, and impose[d] new rights or duties." *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018).

133.     To delay or rescind a legislative rule adopted through notice-and-comment rulemaking, the government must act through notice-and-comment. *See, e.g.*, *Nat'l Fam. Plan. &*

*Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 235 (D.C. Cir. 1992); *Clean Air Council v. Pruitt*, 862 F.3d 1, 8-9 (D.C. Cir. 2017).

134.    But prior to OPM completing the process to rescind and amend, "including the resolution of any judicial review," the E.O. declares that the existing regulations are nonetheless "inoperative and without effect." *Id.*

135.    The E.O. thus directs agencies to disregard the procedures and protections set forth in operative regulations *now*, without abiding by the notice-and-comment requirements of the Administrative Procedure Act.

136.    The January 2025 OPM Memorandum asserted that the E.O. "directly nullified some portions of that rule." OPM Mem. at 4. OPM directed agencies to "disregard the provisions of 5 CFR part 302, subpart F, 5 CFR 210.102(b)(3), and 5 CFR 210.102(b)(4)." *Id.*

137.    The E.O., and OPM's subsequent action, thereby deprive individuals, organizations, and other interested parties – including Plaintiff – from providing OPM important perspectives and data through the notice and comment process prior to subsequent final rulemaking.

138.    By directing agencies to ignore regulations even before they have been properly revoked, the E.O. also mandates that agencies violate the Administrative Procedure Act, which requires courts to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## The Challenged Actions Have Already Harmed PEER And Will Continue To Do So

139.    PEER's mission is to protect civil servants who protect our environment and public health. These civil servants are often whistleblowers who reveal environmental or public health abuses and other violations within their agencies and may face retaliation as a result.

140.    Federal employees who reasonably believe they have information about illegality, fraud, waste, abuse, or other wrongdoing relating to environmental, public health, or scientific issues often come to PEER for legal advice and assistance.

141.    PEER supports many of these whistleblowers with pro bono legal representation and strategic guidance in exercising their rights to make protected whistleblower disclosures. PEER also represents whistleblowers before the Office of Special Counsel ("OSC") and the MSPB if they face retaliation.

142.    To advance its mission, and as part of PEER's core work, PEER produces educational resources about whistleblowing for employees considering reporting abuses, including a survival guide for public employees considering blowing the whistle. As part of PEER's mission to promote high standards of environmental ethics and scientific integrity, and to shine a light on governmental impropriety, PEER regularly publicizes information from whistleblowers regarding illegal or improper government conduct in blog posts, news articles, press releases, reports, and newsletters. It also utilizes the information in conducting its own investigations and crafting Freedom of Information Act ("FOIA") requests for records that could corroborate or supplement whistleblower disclosures to PEER.

143.    PEER investigations prompted by federal whistleblowers have uncovered and led to reforms regarding EPA's regulation of PFAS (per- and polyfluoroalkyl substances) and other toxic chemicals, air pollution in the Front Range of Colorado, public lands grazing management, wildlife laboratory biosafety practices, the regulation of air tour overflights and electronic bicycles impacting national parks, and many other environmental and public health issues.

144.    PEER's ability to perform these mission-critical functions depends on whistleblowers' willingness to share information with PEER.

145.     When a potential client contacts PEER, PEER spends significant time taking information from the potential client, conducting initial evaluations, and evaluating whether PEER will represent each potential client. PEER works closely with each potential client to determine the best course of action tailored to their unique circumstances. The initial intake process can by itself take hours, even for potential clients that PEER does not ultimately represent.

146.     When consulting a potential whistleblower, PEER spends significant time advising the potential client of their rights and options, as well as the risks of (and protections against) retaliation.

147.     Since its founding in 1992, PEER has represented or assisted thousands of federal employee whistleblowers and potential whistleblowers.

148.     Where a PEER client experiences retaliation, or where a potential client comes to PEER after being retaliated against, PEER represents federal employee whistleblowers before the MSPB and the Department of Labor, assists them with the preparation of OSC or Inspector General complaints and disclosures, and advises them on legal matters connected to their employment.

149.     The whistleblower-retaliation protections of Chapter 23 and the corresponding OSC/MSPB procedures of Chapters 75(II) and 12 are critical to instilling confidence in whistleblowers to come forward and disclose misconduct, including to PEER. Whistleblowers are willing to provide information to PEER in large part because of the CSRA's for-cause termination provisions and strong protections against retaliation.  In PEER's experience, clients and potential clients want to know if they can be fired for blowing the whistle, and if so, what their rights are.

150.     The OSC/MSPB procedures of Chapter 75(II) and Chapter 12 are critical avenues of redress that PEER has long utilized to bring claims of whistleblower retaliation to the attention of the agencies charged with protecting the merit-based civil service.

151.    Prevailing parties in OSC/MSPB proceedings are entitled to attorney's fees, *see* 5 U.S.C. § 7701(g), 5 U.S.C. § 1214(g)(2), and settlements in such proceedings often include attorney's fees. When PEER successfully represents clients in OSC/MSPB proceedings and the client is awarded attorney's fees, PEER typically recovers those fees.

152.    Since 2000, PEER has represented numerous employees in OSC/MSPB proceedings and recovered substantial amounts in attorneys' fees for such representation.

153.    PEER also currently has a motion pending before the MSPB seeking approximately $300,000 in attorney's fees.

154.    Prior to renewed Schedule F, PEER routinely advised prospective federal employee whistleblowers in covered positions that they were entitled to the whistleblower protections of Chapter 23 and the corresponding procedural protections of Chapters 75(II) and 12.

155.    PEER regularly represents and works with civil servants who are now at high risk of being reclassified under renewed Schedule F. For example, about half of PEER's clients and potential clients review rulemakings, help write rules, or are otherwise involved in policy-related work, all of which are characteristics relevant to reclassification. *See* OPM Mem. at 2-3; Executive Order 13957 § 5(c).

156.    Employees moved into renewed Schedule F will lose the whistleblower-retaliation protections of Chapter 23 and the OSC/MSPB procedures of Chapter 75(II) and 12 that enable PEER's mission-critical work. As a result, PEER must fundamentally alter its client intake process to tell potential federal whistleblowers that, if they are moved to renewed Schedule F, they will be reclassified as at-will employees, and their agency would not need to give any reason at all for firing or disciplining them.

157.    Without the notice and reasoned basis requirements of the CSRA, whistleblowers will be unlikely to prevail in the event of employer retaliation for their whistleblowing.

158.    This fundamentally alters PEER's relationships with clients and its ability to work on their behalf.

159.    Neither the Executive Order nor the OPM Memorandum clarify how any forthcoming prohibited personnel practices will apply or be enforced for employees moved to renewed Schedule F. PEER therefore cannot provide clear advice or counsel on those issues.

160.    The direct and foreseeable consequence of stripping employees of protections (or otherwise weakening those protections) is to chill potential whistleblowers from reporting potential wrongdoing, directly impeding PEER's ability to carry out its mission-critical functions of representing federal employee whistleblowers and investigating and disclosing misconduct that they identify to the public.

161.    Indeed, several of PEER's clients and potential clients have already indicated that they are reluctant to make confidential whistleblower reports or to speak to the media due to fear of retaliation given renewed Schedule F. For example, after the Executive Order was issued, PEER spoke to one scientist who handles policy issues who was hesitant to provide information or even reveal his name to PEER because he feared summary termination pursuant to renewed Schedule F. PEER has had similar experiences with other federal employees who work at the intersection of science and policy.

162.    As potential whistleblowers lose protections from termination—or perceive that they have lost them—fewer whistleblowers will decide to participate in filing claims before the MSPB or other tribunals, undermining PEER's core activities of representing and supporting agency whistleblowers.

163.    As potential whistleblowers lose protections from termination—or perceive that they have lost them—fewer whistleblowers will provide PEER with information about government misconduct and environmental protection, undermining PEER's core activities of publicizing such lapses through media, blog posts, articles, reports, and other avenues.

164.    Fewer clients willing to bring whistleblower claims will also result in less attorney's fee recoveries for PEER in MSPB proceedings.

165.    Separate and apart from any chilling effect on whistleblowing, reducing the overall number of federal employees with rights to pursue whistleblower retaliation claims through the OSC/MSPB process will further shrink PEER's client base and attorney's fee revenue.

166.    Stripping PEER's client-base of OSC/MSPB procedural protections will also foreclose critical avenues of redress for impacted employees that PEER has historically utilized to bring legal violations to the attention of the agencies charged with protecting the merit-based civil service.

167.    The uncertainty engendered by renewed Schedule F will also impede PEER's ability to provide clear and accurate advice to clients and potential clients regarding their rights and options, further undermining PEER's mission.

168.    PEER submitted a public comment during notice-and-comment rulemaking on the 2024 OPM regulations. The purported rescission of those regulations without notice and comment deprives PEER of its ability to submit comment prior to the rescission and will further impair PEER's mission by depriving it of critical information and procedural safeguards that would have enabled PEER to better serve employees involuntarily moved into renewed Schedule F.

169.    First, the 2024 OPM regulations require agencies to publish in the Federal Register information that would give PEER notice of: agencies where whistleblowers will be particularly

vulnerable (and help PEER defend its clients accordingly); the need to prepare appeals of renewed Schedule F reclassifications on behalf of clients; and potential clients in need of PEER's services.

170.    Second, the 2024 OPM regulations requiring 30-days' advance notice would give PEER time to consult with clients and to appeal any such reclassification before it goes into effect and increases the likelihood that such clients will timely consult with PEER to protect their legal rights and assert those rights. See 5 C.F.R. § 302.602(c).

171.    Third, the 2024 OPM regulations make clear that many reclassified employees would retain MSPB appeal rights. See 5 C.F.R. § 302.603. As noted, PEER's ability to effectively defend its clients' interests often depends on utilizing the MSPB as an avenue of redress.

172.    PEER currently employs seven attorneys, who spend a large portion of their time providing pro bono legal services to federal civil servants.

173.    In addition to providing such legal services, PEER attorneys perform myriad other functions, including: drafting rulemaking petitions and comments, administrative complaints, requests for investigation, reports, scientific papers, blog posts, press releases, and other public products; overseeing chemical testing; analyzing laboratory reports; conducting webinars; doing media interviews; submitting and tracking FOIA requests and reviewing records released in response to those requests; collaborating with other nonprofit organizations on matters of common interest; managing staff; and handling grant applications.

174.    As noted above, the E.O. and OPM Memorandum have already required PEER to expend  scarce attorney resources to alter its intake process to inform potential federal whistleblowers that, if they are moved to renewed Schedule F, they can be fired without any reason given at all, and will be unlikely to prevail—or even have a forum in which to bring a complaint—if they face retaliation for their whistleblowing.

33

175.    The E.O. and OPM Memorandum have also required and will continue to require PEER attorneys to revise PEER's existing educational materials, and generate new materials, to reflect the establishment of a new category of career federal employees and the loss of whistleblower protections for many federal employees.

176.    The E.O. and OPM Memorandum have already led to an uptick in inquiries by federal employees concerned about being reclassified under renewed Schedule F. Responding to these inquiries, which is a core aspect of PEER's mission, has diverted PEER staff from engaging in other mission-critical activities.

177.    Since the Executive Order was promulgated on January 21, 2025, PEER has received at least 32 inquiries from clients or potential clients who have identified Schedule F or renewed Schedule F as the reason for their outreach. That number is increasing rapidly. These inquiries have required PEER to expend additional resources counseling and advising, both because of increased call volume and lengthier counseling sessions due to new fears and concerns related to the Executive Order.

178.    Since January 21, 2025, PEER has spent approximately 37 hours performing work for clients or potential clients in response to these concerns. That number is increasing rapidly as PEER spends more time conducting intakes and providing legal services in connection with renewed Schedule F.

179.    Since January 24, 2025, at least nine individuals reached out to PEER because they were advised by their supervisors that they were likely subject to renewed Schedule F.

180.    While call volume and time spent counseling potential clients is increasing, these additional efforts have not yielded more clients ultimately willing to serve as whistleblowers in furtherance of PEER's mission. For instance, of the 32 inquiries PEER has fielded since January

34

21, 2025 relating to renewed Schedule F, none have resulted in actionable whistleblower disclosures.

181.      Prior to renewed Schedule F, intakes more regularly led to actionable whistleblower disclosures.

182.      As noted above, because of renewed Schedule F, PEER is already witnessing a chilling effect on federal employees who are scared to blow the whistle because they fear that they will be subject to termination without any civil service protections.

183.      Because of the repeated outreach on this topic from the public and from potential clients, PEER has devoted significant communications resources to educate civil servants and the public about renewed Schedule F's threatened revocation of legal protections, including a resource page, webinars and trainings, and blog posts on these topics.

184.      Since January 21, 2025, numerous media outlets have contacted PEER seeking comment or information related to whistleblower rights in light of the Executive Order and this number continues to rise. PEER staff have expended time responding to these inquiries.

185.      Given the increase in outreach from clients and potential clients since the E.O. was issued, PEER anticipates being flooded with new client intake and counseling requests as renewed Schedule F is implemented, specific positions are identified for reclassification, and potentially thousands of career federal employees face imminent reclassification.

186.      Because renewed Schedule F implicates the rights of whistleblowers—the core group with whom PEER works—and because PEER has already received numerous inquiries and questions from its constituents, PEER will need to conduct additional communication and training activities in response to renewed Schedule F.

187.     Responding to the increased demand for legal services and other renewed Schedule F-related activities has required and will require PEER attorneys and other staff to divert resources from the other mission-critical tasks detailed above in paragraph 42. Time spent by PEER staff on work related to renewed Schedule F would otherwise be spent on that other work, including intake unrelated to renewed Schedule F, advocacy, education, and environmental and FOIA litigation.

## **CLAIMS FOR RELIEF**

### **Count One**
### **(Ultra Vires - Violation of 5 U.S.C. § 3302)**

188.     Congress made the competitive service the default for civil service employees in the executive branch, as all employees are presumed part of the competitive service unless excluded. 5 U.S.C. § 2102(a)(1).

189.     Congress has granted the president authority to exclude employees from the competitive service, only where "necessary" and warranted by "conditions of good administration." 5 U.S.C. § 3302.  The E.O. invokes this authority.

190.     The purported exceptions set forth in the Executive Order are neither necessary, nor warranted by conditions of good administration.

191.     Accordingly, the E.O. cannot be justified by, and indeed violates, 5 U.S.C. § 3302.

### **Count Two**
### **(Ultra Vires - Violation of 5 U.S.C. §§ 2302, 7511**

192.     Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

193.     Congress intended that employees whose position is "of a confidential, policy-determining, policy-making or policy-advocating character" (5 U.S.C. §7511(b)(2), 5 U.S.C. §

2302(a)(2)(B)) do not have an expectation of continued employment as they are appointees of a particular presidential administration.

194.    The E.O nonetheless provides: "Career positions of a confidential, policy-determining, policy-making, or policy-advocating character not normally subject to change as a result of a Presidential transition shall be listed in [Renewed Schedule F]." Amended E.O. § 4.

195.    Entry-level and mid-level employees will be so classified.

196.    The EO violates 5 U.S.C. §7511(b) and 5 U.S.C. § 2302(a)(2)(B).

**Count Three**
**(Administrative Procedure Act - Violation of 5 U.S.C. §§ 702, 706, 2302, 7511)**
**As against Defendants Ezell and OPM**

197.    Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

198.    The Administrative Procedure Act requires courts to hold unlawful and set aside any agency action "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

199.    Defendants Ezell and OPM took final agency action in directing agencies to act in violation of 5 U.S.C. §7511(b) and 5 U.S.C. § 2302(a)(2)(B).

200.    Accordingly, Defendants Ezell and OPM are in violation of the Administrative Procedure Act. *See* 5 U.S.C. §§ 702, 706(2)(A), (C), 2302(a)(2)(B), 7511(b).

201.    As a result of Defendants Ezell's and OPM's actions, Plaintiff has suffered and continues to suffer injury.

**Count Four**
**(Ultra Vires – Due Process)**

202.    Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

203.     Congress has vested federal career civil servants with the requisite tenure with property interests in, and due process protections for, that continued employment.

204.     The Fifth Amendment's Due Process Clause provides that the government may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural protections.

205.     The Constitution does not give the president or OPM authority to unilaterally strip these vested rights without due process of law.

206.     By purporting to do just that, the Executive Order was issued without legal authority and is *ultra vires.*

**Count Five**
**(Ultra Vires - Violation of 5 U.S.C. §§ 553, 1103, 1105)**

207.     Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

208.     As the Executive Order acknowledges, OPM must engage in rulemaking to rescind or amend existing regulations, including those promulgated by OPM in its 2024 Final Rule, "Upholding Civil Service Protections and Merit System Principles."

209.     Defendants lack authority to circumvent the notice-and-comment rulemaking provisions of the Administrative Procedure Act by unilaterally providing that existing regulations are "inoperative and without effect."

210.     By purporting to bypass Congress' requirements for reasoned agency rulemaking, the Executive Order violates 5 U.S.C. §§ 553, 1103, 1105.

**Count Six**
**(Administrative Procedure Act - Violation of 5 U.S.C. §§ 553, 1103, 1105)**
**As against Defendants Ezell and OPM**

211.    Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

212.    The Administrative Procedure Act requires courts to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

213.    The Act requires agencies to follow public notice-and-comment rulemaking procedures before rescinding, delaying, or amending regulations. *See* 5 U.S.C. § 553(b), (c).

214.    Defendants Ezell and OPM failed to provide notice and an opportunity for public comment prior to taking final agency action regarding OPM's 2024 regulations inoperative and without effect.

215.    Accordingly, Defendants Ezell and OPM are in violation of the Administrative Procedure Act. *See* 5 U.S.C. §§ 706(2)(D); 553, 1103, 1105.

216.    As a result of Defendants Ezell's and OPM's actions, Plaintiff has suffered and continues to suffer injury.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court:

A.  Declare that the Executive Order is not justified by and contrary to 5 U.S.C. § 3302 and in violation of 5 U.S.C. §7511(b) and 5 U.S.C. § 2302(a)(2)(B) and therefore *ultra vires* and null and void;

B.  Declare that the Executive Order is contrary to the Fifth Amendment to the United States Constitution and therefore *ultra vires* and null and void, and that civil servants with

accrued status and due process rights retain those rights if they are involuntarily moved between Schedules;

C.  Declare that the Executive Order improperly nullifies regulations in violation of 5 U.S.C. §§ 553, 1103, 1105 and therefore *ultra vires* and null and void;

D.  Declare that the Executive Order instructs agencies to act in a way that violates the Administrative Procedure Act;

E.  Declare that Defendant Charles Ezell and Defendant Office of Personnel Management have violated the Administrative Procedure Act by (1) directing agencies to act in violation of 5 U.S.C. §7511(b) and 5 U.S.C. § 2302(a)(2)(B) and (2) failing to provide notice and an opportunity for public comment prior to taking final agency action regarding OPM's 2024 regulations inoperative and without effect;

F.  Preliminarily and permanently enjoin Defendant Charles Ezell, Defendant Office of Personnel Management, and their agents and successors, from (1) implementing or otherwise giving effect to the Executive Order; and (2) failing to enforce and implement 5 C.F.R. part 302, subpart F, 5 C.F.R. 210.102(b)(3), and 5 C.F.R. 210.102(b)(4) unless and until they are rescinded after providing notice and the opportunity for comment in compliance with the Administrative Procedure Act;

G.  Vacate and set aside the January 27, 2025 OPM Memorandum;

H.  Award Plaintiff its costs, attorneys' fees, and other disbursements for this action; and

I.  Grant any other relief this Court deems appropriate.

Dated: March 12, 2025                    Respectfully Submitted,

                                         s/ Mark B. Samburg

                                         Mark B. Samburg (Bar No. 31090)
                                         Elena Goldstein*
                                         Michael Martinez*
                                         Kevin E. Friedl* (Admitted only in New
                                         York; practice supervised by D.C. Bar
                                         members)
                                         Victoria S. Nugent (Bar No. 15039)
                                         DEMOCRACY FORWARD FOUNDATION
                                         P.O. Box 34553
                                         Washington, D.C. 20043
                                         Telephone: (202) 448-9090
                                         Fax: (202) 796-4426
                                         msamburg@democracyforward.org
                                         egoldstein@democracyforward.org
                                         mmartinez@democracyforward.org
                                         kfriedl@democracyforward.org
                                         vnugent@democracyforward.org

                                         Jonathan Weissglass*
                                         LAW OFFICE OF JONATHAN
                                         WEISSGLASS
                                         1939 Harrison St., Suite 150-B
                                         Oakland, CA 94612
                                         Telephone: (510) 836-4200
                                         jonathan@weissglass.com

                                         Donald K. Sherman*
                                         Nikhel S. Sus*
                                         CITIZENS FOR RESPONSIBILITY AND
                                         ETHICS IN WASHINGTON
                                         P.O. Box 14596
                                         Washington, D.C. 20044
                                         Telephone: (202) 408-5565
                                         Fax: (202) 588-5020
                                         dsherman@citizensforethics.org
                                         nsus@citizensforethics.org

                                         *Admitted *pro hac vice*