**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY
962 Wayne Avenue, Suite 610
Silver Spring, MD 20910,

*Plaintiff,*

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street, N.W.
Washington, DC 20001,

AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.
Washington, DC 20036,

AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS
815 Black Lives Matter Plaza, N.W.,
Washington, DC 20006,

and

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, LOCAL 1923
6401 Security Boulevard
Baltimore, MD 21235

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States of America,
1600 Pennsylvania Avenue, N.W.
Washington, DC 20500,

**FIRST SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Case No. 8:25-cv-00260-PX

CHARLES EZELLSCOTT KUPOR, in his official capacity
as Acting Director of
Office of Personnel Management,
1900 E Street, N.W.
Washington, D.C. 20415,

And

and

OFFICE OF PERSONNEL MANAGEMENT,
1900 E Street, N.W.
Washington, D.C. 20415

*Defendants*.

PlaintiffPlaintiffs Public Employees for Environmental Responsibility (("PEER)"), American Federation of Government Employees, AFL-CIO ("AFGE"), American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME"), the American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO"), and AFGE Local 1923 ("Local 1923" or "The Local") hereby suessue Defendants Donald J. Trump, Charles EzellScott Kupor, and the Office of Personnel Management (("OPM)") and allegesallege as follows:

1. This suit seeks injunctive and declaratory relief with respect to the Executive Order issued byOn January 20, 2025, on his first day in office, President Donald J. Trump on January 20, 2025,issued an Executive Order entitled "Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce" ("the Executive Order," or "E.O.") and an OPM Memorandum on the same subject." or "the E.O."). The Executive Order purported to establish the framework for stripping protections against political firings from a large swath of the career

civil service. As President Trump signed the Executive Order, he proclaimed, "We're getting rid of all the cancer."

2. On April 23, 2025, OPM, the chief human resource agency for the federal government, published a Notice of Proposed Rulemaking ("NPRM") pursuant to the Executive Order. OPM received over 40,000 comments on the NPRM, 94 percent of which—including comments from Plaintiffs—opposed changes proposed by the NPRM.

3. Nonetheless, on February 6, 2026, OPM published a final rule, entitled "Improving Performance, Accountability and Responsiveness in the Civil Service," with virtually no meaningful changes from the NPRM ("OPM Final Rule"). The same day OPM released the rule, OPM Director Scott Kupor told the press, "I don't think the idea that people come to the government because they think they have lifetime employment—I don't think that's a very compelling idea …. There's no such thing as lifetime employment."

4. President Trump and Director Kupor can have whatever views they want of the career civil service. What they cannot do is ignore the law and disregard Congress's design. Yet that is precisely what the Executive Order and OPM Final Rule do. These government actions, along with the forthcoming executive order or orders that actually strip civil servants of their due process protections, constitute an unlawful attempt to dismantle the nonpartisan, merit-based civil service that Congress and the Executive have advanced over the past 140 years.

~~2.~~5. Selecting and removing federal career employees based on ~~the basis of~~ merit—their ability to do the jobs for which they are hired—is neither a new concept nor, until recently, a controversial one. ~~For more than 140 years, meritocratic principles have been essential to the efficient and continuous operation of the career civil service.~~Since 1883, the guiding principle of

the federal civil service system has been that career civil servants are selected and retained on the basis of merit and are not removed simply at the whim of the president or his political appointees.

3. 6. Before that, a "spoils system" reigned and each successive president simply filled federal jobs with political allies. Under this patronage system, positions were not filled based on qualifications or merit, and when presidential administrations changed, employees were regularly dismissed from government regardless of how well they had performed their duties. The spoils system was rife with corruption. By 1832, Senator Henry Clay presciently called it

> a detestable system . . . And if it were to be perpetuated—if the offices, honors, and dignities of the people were to be put up to public scramble, to be decided by the result of every presidential election—our Government and institutions, becoming intolerable, would finally end in despotism.

Jay M. Shafritz et al., *Personnel Management in Government: Politics and Process* (5th ed. 2001).

4. 7. Congress eventually repudiated the spoils erasystem and created the modern civil service on which this country depends and under which it has thrived. Today, civil servants

> print and mint our money, control narcotics, regulate immigration, and collect taxes and duties. They help to conserve land and revitalize land that is unproductive, bring electricity into rural homes, enforce Federal laws, and administer Social Security. They operate the atomic energy program, forecast the weather, and protect national parks and forests. They conduct research—in physics, electronics, meteorology, geology, metallurgy, and other scientific fields—which has far-reaching effects on the health, welfare, economy, and security of our Nation. They control our airways, standardize our weights and measures, develop flood-control measures, and perform hundreds of other services required by the American people.

U.S. Civ. Serv. Comm., Pub. Info. Off., *Biography of an Ideal: A History of the Federal Civil Service* 2 (1974).

5. 8. Congress' requirement of merit-based hiring and its attendant protections were initially limited to a small number of federal jobs, but the share of the federal workforce that Congress has determined should be selected and retained on the basis of merit grew steadily, now comprising; as of January 2025, it comprised the vast majority of the country's 2.3 million federal

workers. Over decades, merit-based selection and retention of employees have produced a stable and successful civil service that effectively carries out the ordinary and continuous work of the federal government and has effectuated the president's policies and Congress' programs regardless of political party.

~~6.~~9. To ensure accountability to the president, new administrations appoint approximately 4,000 noncareer employees to direct their agendas' implementation. These appointees direct and work in concert with career civil servants, whose expertise, experience, and skills allow them to effectively carry out policy direction while completing the nonpartisan work of government. Without ~~these~~ talented career employees' expertise, presidential administrations would be significantly limited in their ability to implement their agendas, and the operations of the federal government—everything from Social Security to national parks—would grind to a halt.

~~7.~~10. Now, however, the Trump ~~administration~~Administration unlawfully seeks to do just that and thereby undermine the meritocratic system Congress enacted ~~and return to a spoils system, with all the dangers it entails.~~ . Its efforts to do so are contrary to statute, unconstitutional in multiple respects, and in violation of the Administrative Procedure Act.

## PARTIES

~~8.~~11. Plaintiff PEER (Public Employees for Environmental Responsibility) is a non-profit, non-partisan organization headquartered in Maryland. PEER provides direct services to environmental and public health professionals, land managers, scientists, enforcement officers, and other civil servants dedicated to upholding environmental laws and values. PEER provides pro bono legal services to current and former public employees who hold government accountable to environmental ethics, compliance with environmental laws, and scientific integrity standards.

PEER represents and defends federal whistleblowers, investigates and exposes improper or illegal government actions, and works to improve laws and regulations impacting PEER's clients.

12. Plaintiff AFGE (American Federation of Government Employees) is a labor organization and unincorporated, non-profit association headquartered in Washington, D.C. AFGE, the largest federal employee union, represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States.

13. AFGE's representation regularly includes the direct representation of federal employees in employment related matters before federal courts and administrative agencies, such as petitions for review to the U.S. Court of Appeals for the Federal Circuit, appeals before the Merit Systems Protection Board ("MSPB"), and complaints before the Equal Employment Opportunity Commission ("EEOC").

14. AFGE members include nurses caring for our nation's veterans, analysts helping small businesses get loans, researchers supporting our nation's schools, scientists conducting critical research, health care workers serving on military bases, civilian employees in the Department of Defense supporting our military personnel and their families, and employees of the Social Security Administration making sure retirees receive the benefits they have earned.

15. AFGE was founded in 1932 by federal employees seeking to create a right to fair employment and pay during the Great Depression. As the union grew, it advocated for and secured numerous victories for career civil servants, including the passage of the Civil Service Reform Act of 1978.

16. AFGE is dedicated to fighting for dignity, safety, and fairness on the job for its members, and promoting efficiency and the improvement of government service so that government can more effectively serve the American people.

17. Plaintiff AFSCME (the American Federation of State, County & Municipal Employees, AFL-CIO) is a national labor organization and unincorporated membership association headquartered in Washington, D.C. AFSCME is the largest trade union of public employees in the United States, with around 1.4 million members organized into approximately 3,400 local unions, 58 councils and affiliates in 46 states, the District of Columbia, and Puerto Rico. AFSCME, through its subordinate body Council 20 and its constituent local unions, represents federal civilian employees in agencies and departments across the federal government.

18. AFSCME was founded in 1932 by civil servants seeking to combat state efforts to replace a competitive civil service system with political patronage, united by a simple idea: that a professional civil service is essential to a strong democracy, and public service should be delivered by individuals dedicated to serving their communities, not those who have close connections to politicians. This idea has sustained AFSCME through nearly nine decades, as the union has succeeded in passing and strengthening civil service laws across the United States.

19. AFSCME members include nurses, correction officers, child care providers, emergency medical technicians, sanitation workers, school bus drivers, civil engineers, policy analysts, and more, all with one thing in common: a dedication to making our communities stronger, healthier, and safer. Its members working for the federal government make our communities stronger, healthier, and safer by working to ensure aviation safety at the Federal Aviation Administration, agricultural sustainability at the Department of Agriculture, criminal justice through the Department of Justice, and more.

20. Plaintiff AFL-CIO (American Federation of Labor and Congress of Industrial Organizations) is a federation of 63 national and international labor unions that represent nearly 15 million working people nationwide, including substantial numbers of employees in the federal

sector. The AFL-CIO advocates on behalf of its affiliated unions and their members concerning wages, hours, working conditions and the preservation of statutory collective bargaining rights. The AFL-CIO brings this action to protect its institutional interests and those of its affiliated unions whose members are directly and adversely affected by Defendants' actions.

21. The AFL-CIO's affiliated unions include Plaintiff unions and other labor organizations representing employees throughout the federal government. These affiliated labor organizations collectively represent hundreds of thousands of federal employees across agencies, occupational groups and bargaining units. Such labor organizations include, but are not limited to, the International Federation of Professional and Technical Engineers ("IFPTE"), National Federation of Federal Employees ("NFFE"), which is affiliated with the IAM Union, and the National Association of Government Employees ("NAGE"), affiliated with the Service Employees International Union ("SEIU").

22. The AFL-CIO's affiliate IFPTE is a national labor organization that represents professional, technical, and scientific employees within the federal government, including administrative judges and associated professions within the jurisdiction of the MSPB, as well as engineers, scientists, and technical specialists employed at agencies such as the Department of Defense, NASA, and other federal departments. The AFL-CIO's affiliate NFFE is a national labor organization representing professional and non-professional federal government employees across a broad range of agencies including the Department of Veteran Affairs, Department of Defense, U.S. Forest Service, National Park Service, U.S. Fish and Wildlife Service, Bureau of Land Management and Bureau of Reclamation, Department of Housing and Urban Development, General Services Administration, and many others across the federal government. The AFL-CIO's affiliate NAGE is a national labor organization representing both professional and non-

professional federal employees across a wide range of roles in various agencies, including, but not limited to the Departments of Defense, Veterans Affairs, Commerce, Transportation, Interior, and the Environmental Protection Agency.

23. AFSCME, AFGE, and AFL-CIO bring this action on behalf of their affiliates and members, and also on behalf of themselves as organizations.

24. Plaintiff AFGE Local 1923 is a local affiliate of AFGE, headquartered in Woodlawn, Maryland. Local 1923 represents multiple bargaining units totaling nearly 30,000 nonsupervisory civil servants who work for multiple federal agencies in the Maryland area. These agencies include the Social Security Administration, the Centers for Medicare and Medicaid Services, the Department of Defense (including U.S. Army, U.S. Navy and Naval Academy, Defense Commissary Agency, and Army and Air Force Exchange Service), the U.S. Coast Guard, the National Mediation Board, and the Metropolitan Washington Airports Authority. These bargaining unit members are highly skilled and perform critical and diverse functions to administer financial and medical benefits for vulnerable Americans, facilitate air travel through the region's central airports, coordinate labor-management for critical transportation industries, and support the country's armed forces.

25. Local 1923's bargaining unit employees report to multiple duty stations in the Maryland area, but employees are located across the country. The Local currently has approximately 4,980 members, with membership being voluntary and available to all bargaining unit employees represented by Local 1923. All members of AFGE Local 1923 are also members of AFGE. The Local's operations are funded through voluntary dues paid by members.

26. AFGE Local 1923's mission is to advocate for and promote the interests of bargaining unit employees in their federal employment. As the exclusive bargaining representative

of these workers, AFGE Local 1923 provides many services to all bargaining unit employees. Core functions of AFGE Local 1923 include collective bargaining with agencies to obtain fair and reasonable collective bargaining agreements ("CBAs"); filing and negotiating grievances against agencies to enforce the terms and conditions of CBAs; pursuing arbitrations on behalf of workers to enforce CBAs; and providing other support, guidance, and resources to bargaining unit employees.

27. AFGE Local 1923 brings this action on behalf of its members, and also on behalf of itself as an organization.

~~9.~~28. Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

~~10.~~29. Defendant Office of Personnel Management ~~(OPM)~~ is a federal agency that serves as the chief human resources agency and personnel policy manager for the Federal government.

~~11.~~30. Defendant ~~Charles Ezell~~Scott Kupor is the ~~Acting~~ Director of OPM. He is sued in his official capacity.

**JURISDICTION AND VENUE**

~~12.~~31. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et~~.~~ seq.* and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*.

~~13.~~32. Venue properly lies within the District of Maryland because ~~Plaintiff resides in this judicial district. 28 U.S.C. § 1391(e)(1).~~ Plaintiffs PEER and AFGE Local 1923 reside in this judicial district. 28 U.S.C. § 1391(e)(1). Additionally, Plaintiffs AFSCME, AFGE, AFL-CIO, and AFGE Local 1923 represent numerous federal employees who reside and work within this District

and who will be subject to Schedule Policy/Career ("P/C") when the forthcoming executive order or orders move positions.

**BACKGROUND**

**The Transition from the Spoils System to a Modern, Professional Civil Service**

14.33. Since 1870, Congress and the presidents have consistently sought to ensure that selection and retention of federal career civil servants are based on merit, and isolated from the risk of undue partisan influence. These efforts grew out of the failures and corruption of the spoils system, and have all been directed at the improvement and professionalization of the civil service for the benefit of the government and the nation.

1. In 1870, President Ulysses S. Grant asked Congress to undertake "a reform in the civil service of the country," recognizing that the spoils system "does not secure the best men, and often not even fit men, for public place. The elevation and purification of the civil service of the Government will be hailed with approval by the whole people of the United States." Ulysses S. Grant, *Second Annual Message* (Dec. 5, 1870).

2. Congress obliged, authorizing the formation of a commission to study rules and regulations concerning civil service hiring that would "best promote the efficiency" of the civil service. George William Curtis, U.S. Civ. Serv. Comm., *The Reform of the Civil Service: A Report to the President*, U.S. Gov't Printing Off. 5 (1871).

3. The commission concluded that, under the prevailing spoils system, "both selection and removal are largely determined, not by the welfare of the service, but by political stress and exigency." *Id.* at 16.

4. The inevitable result of such a system was that civil servants of the time were generally *not* the best people for their jobs. Indeed, "[t]he doctrine of rotation in office implies that merit should not be considered." *Id.* at 17.

5. Nor did the damage end there. Besides suffering from an inferior workforce, government was derailed by staff turnover following each administration change. *Id.* at 6.

15.34. To protect career Federal employees from undue partisan influence and ensure that the public would benefit from a professional and competent civil service regardless of political affiliation, civil service advocates and then Congress sought to establish a federal nonpartisan career civil service selected on the basis of merit rather than political affiliation. The reform movement culminated in 1883 when Congress passed the Pendleton Civil Service Reform Act. The Pendleton Act established merit-based hiring for federal positions "as nearly as the conditions of good administration will warrant," 22 Stat. 403 (Jan. 16, 1883), and provided some employment protections to employees hired in those positionsThe Pendleton Act laid the foundation for the modern civil service.

16.35. In 1897, President William McKinley issued Executive Order 101, mandating that "[n]o removal shall be made from any position subject to competitive examination except for just cause and upon written charges filed with the head of the Department, or other appointing officer, and of which the accused shall have full notice and an opportunity to make defense."

17.36. Congress subsequently codified similar protections in 1912's Lloyd-La Follette Act, prohibiting removal of employees in the "classified [i.e., competitive] civil service" "except for such cause as will promote the efficiency of said service," and mandating an opportunity for an employee to respond to the basis for removal. *See* 37 Stat. 555 (Aug. 24, 1912).

6. The Lloyd-La Follette Act was motivated, in part, by an effort to "do away with the discontent and suspicion which now exists among [civil service] employees and . . . restore that confidence which is necessary to get the best results from the employees." 48 Cong. Rec. 4654 (1912) (remarks ofOver Rep. Calder).

18.37. As time went on, Congress continued to bolster civil service protections. In 1944, Congress passed the Veterans' Preference Act, providing additional procedural protections to veterans serving in the civil service.

19.38. In 1962, President John F. Kennedy issued Executive Order 10988, extending Veterans' Preference Act rights and protections to non-veteran competitive service employees.

7. Despite these advances in civil service protections, the Nixon administrationAdministration undertook a "concerted and concealed endeavor 'to politicize' the executive branch," *Senate Aides See Bureaucracy Use For Political Gain*, N.Y. Times (June 8, 1974), https://perma.cc/43BY-WD7A, and to populate the government with loyalists. U.S. Cong., H. Comm. On Post Office & Civil Service, Subcomm. on Manpower & Civ. Serv., *Final Report on Violations and Abuses of Merit Principles in Federal Employment, Together with Minority Views*, at 147 (Dec. 30, 1976).

20.39. As part of that effort, Nixon's White House Personnel Office sought to gain greater "accountability" throughout the executive branch, including by "reorganiz[ing] sections of an agency and, in doing so, eliminate the jobs of" employees the administrationAdministration wanted to purge. *Id.*

8. Whistleblowers at the Senate Watergate hearings later showed that the Nixon Administration tried to implement the "Malek Manual," a secret blueprint to replace the civil service merit system with a political hiring scheme that would have begun by purging all

Democrats from federal employment. *See* Joseph D. Gebhardt et al., *Blueprint for Civil Service Reform, Fund for Constitutional Government* (1976).

9. Following Nixon's resignation, President Gerald R. Ford reaffirmed the importance of the federal civil service and the merit principles that underpin it. President Ford wrote to department and agency heads that the federal government's ability "to function and move ahead even under the most difficult circumstances . . . is due chiefly to more than two million career civil servants who, day-in and day-out, give of themselves in a thoroughly dedicated and efficient manner." Gerald R. Ford, *Memorandum on the Career Civil Service* (SepSept. 20, 1974).

21.40. He instructed agency heads "to see to it that the merit principles contained in the [Pendleton] Act and the personnel laws and regulations are fully and effectively carried out." *Id.*

**The Creation of a Comprehensive Merit-Based Civil Service System**

10. President Jimmy Carter proposed a "comprehensive program to reform the Federal Civil Service system." Jimmy Carter, *Federal*The Civil Service Reform *Message to the Congress* (Mar. 2,Act ("CSRA") of 1978).

22.41. In response, Congress recognized embodied Congress's judgment that federal employment "consistent with merit system principles and free from prohibited personnel practices" would best "provide the people of the United States with a competent, honest, and productive Federal work force reflective of the Nation's diversity." Pub. L. No. " and enacted the Civil Service Reform Act of 1978 ("CSRA").95-454, § 3, 92 Stat. 1111-12. (1978). The CSRA "comprehensively overhauled the civil service system," *Lindahl v. OPM*, 470 U.S. 768, 773 (1985), strengthening long-standing core civil service protections in the process.

23.42. The CSRA's comprehensive "new framework," *id.* at 774, protected careerCSRA protects federal employees from undue partisan political influence, and extendedprovides adverse

action rights to a largerlarge cohort of federal employees, so that the business of government couldcan be carried out efficiently and effectively, in compliance with the law, and in a manner that encourages individuals to apply to participate in the civil service. It is the principal foundation of the modern merit system.

24.43. The CSRA provides that "[f]ederal personnel management should be implemented consistent with [nine] merit system principles." 5 U.S.C. § 2301(b).

25.44. The CSRA's merit system principles apply to all executive agencies, and include: a) "All employees and applicants for employment should receive fair and equitable treatment" without regard to a range of personal characteristics, including political affiliation; b) "The Federal work force should be used efficiently and effectively;""; c) "Employees should be retained on the basis of the adequacy of their performance, inadequate performance should be corrected, and employees should be separated who cannot or will not improve their performance to meet required standards;""; and d) Employees should be "protected against arbitrary action, personal favoritism, or coercion for partisan political purposes." *See* 5 U.S.C. §§ 2301(a), (b)(1)-(8).

26.45. Giving teeth to these principles, Congress barred federal employees from engaging in certain prohibited personnel practices in the civil service, including: a) discriminating "for or against any employee or applicant for employment . . . on the basis of . . . political affiliation;""; b) coercing "the political activity of any person" or taking "any action against any employee or applicant for employment as a reprisal for the refusal of any person to engage in such political activity;""; c) retaliating against lawful disclosure of information that an employee reasonably believed evinces "any violation of any law, rule, or regulation," or "gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety" (whistleblowing); and d) discriminating "for or against any employee or applicant for employment

on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others." -5 U.S.C. §§ 2302(b)(1) () (12).

11. In addition to the codification of the merit system principles and the enumeration of the prohibited personnel practices, the CSRA created a """new framework for evaluating adverse personnel actions against'against" federal employees. *United States v. Fausto*, 484 U.S. 439, 443 (U.S. 1988) (quoting *Lindahl*, 470 U.S. at 774).

27.46. . That framework includes rights and procedures by which civil service employees may challenge adverse actions, including those resulting from and prohibited personnel practices.

47. The CSRA also created new entities to hear such challenges. Congress created the MSPB to serve as an independent adjudicator of certain claims, 5 U.S.C. §§ 1201–1206, and created the Office of Special Counsel ("OSC") to investigate and prosecute prohibited personnel practices, 5 U.S.C. §§ 1211–1219. Congress believed that the creation of a "strong and independent" MSPB and OSC was necessary to "discourage subversion of merit principles." S. Rep. In the 142 years since the Pendleton Act, Congress has further modified the selection criteria and the specific protections available to members of the civil service, including via the Civil Service Due Process Amendments Act of 1990, which, among other things, extended appeal rights to many excepted service employees.No. 95-969, at 6–7 (1978).

12. Pub. L. 101-376, 104 Stat. 461.

13. Throughout these enactments, the basic principles of the federal civil service have remained the same: career civil servants are selected on the basis of merit and are not removed simply on account of their political views or those of the president.

**The Civil Service Today**

**Classifications of Employees**

28.48. Federal law generally classifies civil service employees into three categories – the competitive service, the excepted service, and the Senior Executive Service ("SES"), each with distinct selection, compensation, and adverse action rights. *See generally* Cong. Rsch. Serv., *Categories of Federal Civil Service Employment: A Snapshot* (MarchMar. 26, 2019), https://tinyurl.com/akre8hs6perma.cc/52RZ-DWYB ("CRS Categories").

29.49. Roughly 70% of all federal workers are in the competitive service. *Id.* at 4.

30.50. Congress made the competitive service the default for civil service employees in the executive branch; all federal employees are presumed part of the competitive service unless specifically excluded. *See* 5 U.S.C. §§ 2102(a)(1), 2103; 5 C.F.R. pts. 213, 302; *Upholding Civil Service Protections and Merit System Principles*, 89 Fed. Reg. 24982-01, 24988 (AprilApr. 9, 2024) ("2024 OPM Final Rule" or "Final Rule").

31.51. By statute, the president possesseshas authority to exclude employeescreate exceptions from the competitive service under specific circumstances. The president is permitted to "prescribe rules governing the competitive service," but may make only "necessary exceptions of positions from the competitive service" when warranted by "conditions of good administration." 5 U.S.C. § 3302.

32.52. Prior to the E.O.,Executive Order, there were five categories of positions, or schedules, excepted from the competitive service: Schedules A- through E. Schedules of Expected Positions, 5 C.F.R. § 6.2. (2026). Schedules A, B, and D provide an exception for positions where it is "not practicable" or "impracticable" to impose a hiring condition. *Id.* Schedule E is for the special and limited category of administrative law judges. And Schedule C is reserved for political appointees. *Id.* After the Executive Order, and separately from the actions at issue in this case, President Trump created a sixth category excepted from the competitive service, Schedule G, for

"noncareer positions of a policy-making or policy-advocating character." Creating Schedule G in the Expected Service, 90 Fed. Reg. 5 C.F.R. § 6.2. Schedules C and E are for the special and limited categories of political appointees and administrative law judges. *See, e.g.*, 5 C.F.R. §§ 6.2, 734.104.34753, 34753 (July 17, 2025).

**Civil Service Protections**

33.53. Hiring into the competitive service is conducted by examinations, which are designed to be "practical in character and relate to matters that fairly test the relative capacity and fitness of the applicants for the appointment sought." CRS Categories at 2 (internal quotations omitted). *See*); *see also* 5 U.S.C. § 3304; 5 C.F.R. § 332.101.

34.54. Employees in the competitive service are not "at-will" employees but rather may be subjected to adverse personnel actions only for good cause, where the adverse action will promote "the efficiency of the service." 5 §§ U.S.C. §§ 7503(a), 7513(a). *See*); *see also* 5 C.F.R. §§ 752.102(a), 752.202(a) (2026).

35.55. For minor adverse actions, competitive service employees who have completed probationary periods have due process protections like notice and appeal rights and receive written notice with the reason for the action, a reasonable time to respond, and a written decision. *See* 5 U.S.C. § 7503(b).

36.56. For more significant adverse actions, such as termination, reduction in pay or grade, or long suspensions, employees may also have other due process protections including the right to appeal to the Merit Systems Protection Board ("MSPB").), the independent agency, set up by the CSRA, to adjudicate federal personnel claims. *See, e.g.,* 5 U.S.C. §§§ 7513. Employees may appeal MSPB decisions to federal court. *See* 5 U.S.C. §§ 7513(d), 7701-7703; 1211.

~~37.~~57. The MSPB will not sustain an adverse employment action that is unsupported by a sufficient evidentiary basis, 5 U.S.C. § 7701(c)(1), is not in accordance with law, 5 U.S.C. § 7701(c)(2), or is based on a "prohibited personnel practice~~." 5 U.S.C. § 7701(c)(2).~~," *id.*

58. ~~Prohibited personnel actions include discrimination on the basis of political affiliation or activity, granting any preference "not authorized by law, rule, or regulation" to an employee or applicant, discrimination "on the basis of conduct which does not adversely affect" performance, or any other personnel action, "if the taking or failure to take such action violates … the merit system principles," including whistleblower protections~~Employees may appeal MSPB decisions to federal court, with the U.S. Court of Appeals for the Federal Circuit having exclusive jurisdiction over many MSPB appeals. *See* 5 U.S.C. §§ 7513(d), 7701–7703.

~~14.~~ The rules related to ~~. 5 U.S.C. § 2302(b). Under 5 U.S.C. § 7515, supervisors are subject to penalties for retaliation against whistleblowers.~~

~~38.~~59. ~~Hiring works differently for~~ the excepted service~~, and~~ are different. With respect to hiring, applicants for excepted positions are not subject to an examination process. But excepted service applicants, like competitive service applicants, are considered "solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity." 5 U.S.C. § 2301(b)(1~~). *See*~~); *see also* ~~5 U.S.C~~*id*. § 3320.

~~39.~~60. In general, excepted service employees have the same notice and appeal rights for adverse personnel actions, though they typically must satisfy longer durational requirements before they become entitled to these rights. *See* CRS Categories at 5; 5 U.S.C. § 7511(a)(1).

~~40.~~61. As with the competitive service, members of the excepted service who meet the requisite durational requirements may only be terminated for cause. *See* 5 U.S.C. §§ 7503(a), 7513(a); 5 C.F.R. § 752.102(a); ~~5 C.F.R~~*id*. § 752.202(a).

41.62. An excepted service member in a "covered position" likewise," like a competitive service member, has protections against "prohibited personnel practices" practice[s]" like discrimination on the basis of political affiliation. *See* OPM Final Rule, 89 Fed. Reg. at 24987-88; 5 U.S.C. §§ 2302(a) ()(2)(B); 2302(b).

63. Career members of the SES also have due process protections once they are past their probationary periods. They can only be removed from federal service based on misconduct, neglect of duty, malfeasance, or failure to accept a reassignment. 5 U.S.C. § 7543(a). Before a removal can be effectuated, a career SES member is entitled to notice, an opportunity to respond, and a written decision. Career members of the SES have a right to appeal any adverse action to the MSPB. 5 U.S.C. §§ 7541–7543.

64. Removal of career SES employees from the SES for less than fully successful performance is governed by a separate provision. 5 U.S.C. § 3592.

65. Career SES members are also protected from prohibited personnel practices. 5 U.S.C. § 2302(a)(2)(B).

66. TheThese protections apply to all career members of the SES who have completed their probationary periods. There are no exceptions from these protections based on the type of work that career SES members perform.

42.67. In short, the vast majority of career federal workers, whether in the competitive or, excepted service, or Senior Executive Service, are entitled to the robust civil service protections outlined above once they have been in service for a period of 1 or 2 years and are beyond any probationary period.

**Civil Service by the Numbers**

15. The modern federal workforce consists of approximately two million civilian employees, nearly 30% of which are veterans. *See* Elizabeth Byers & Kennedy Teel, *A Profile of the 2023 Federal Workforce,* P'ship for Pub. Serv. (2024), https://tinyurl.com/bddbn8mz.

43.1. Roughly 20% of the federal workforce is located inside the Washington, D.C. metropolitan area, with the rest of the federal civilian workforce spread across all fifty states. For example, 5.7% of the federal civilian workforce, or more than 110,000 employees, are located in Texas; 4.2% (or more than 84,000) in Florida; 6.6% (or more than 131,000) in California. *Id.*

16. Public sector jobs have long been a source of opportunity and security that help individuals and families, particularly from historically marginalized groups, build economic security and move into the middle class. *See, e.g.*, Michael Madowitz et al., *Public Work Provides Economic Security for Black Families and Communities*, Ctr. for Am. Progress (2020), https://tinyurl.com/5fuunefx.

## ALLEGATIONS

### The Challenged Actions Upend Longstanding Law and Practice

44.68. The E.O. and The Challenged Executive Order and OPM Memorandumthe OPM Final Rule seek to unlawfully strip these protections from a wide swath of the civil service. They run contrary to the core principles of the federal civil service established by Congress.

### President Trump Has Previously Attempted to Politicize the Civil Service

45.69. This is not the first time that a Trump Administration has attempted to gut civil service protections from the career workforce.

46.70. On October 21, 2020, President Trump issued Executive Order No. 13957, "Creating Schedule F in the Excepted Service," excepting from the competitive service "positions of a confidential, policy-determining, policy-making, or policy-advocating character not normally

subject to change as a result of a Presidential transition." 85 Fed. Reg. 67631, 67632 (Oct. ~~26~~21, 2020).

~~47.~~71. Executive Order No. 13957 included a bald assertion that "conditions of good administration," specifically "the need to provide agency heads with additional flexibility to assess prospective appointees without the limitations imposed by competitive service procedures," made the creation of Schedule F necessary. 85 Fed. Reg. at 67631.

~~48.~~72. Executive Order No. 13957 further asserted that conditions of good administration made it necessary to except Schedule F positions from certain adverse action protections. In other words, Schedule F sought to radically alter ~~federal hiring and~~ firing of career civil servants in a manner at odds with the CSRA and its amendments.

~~49.~~73. Because the first Trump Administration ended shortly after Executive Order No. ~~14003~~13957 was signed, no position in the federal civil service was ever moved to Schedule F. The Trump Administration's Office of Management and Budget, however, provided a preview of what was expected, designating 68 percent of its employees as Schedule F, including lower-level GS-9 and 10 positions. U.S. Gov't. Accountability Off., GAO-22-105504, *Agency Responses and Perspectives on Former Executive Order to Create a New Schedule F Category of Federal Positions*, at 14, 19 n.14 (2022), https://~~tinyurl.com/yexbj56d~~perma.cc/5T77-P6MG.

~~50.~~74. On January 22, 2021, President Biden issued Executive Order No. 14003, "Protecting the Federal Workforce~~,~~," revoking Executive Order No. 13957. 86 Fed. Reg. 7231 (Jan. 22, 2021).

~~51.~~75. Executive Order No. 14003 determined that the creation of Schedule F "not only was unnecessary to the conditions of good administration, but also undermined the foundations of the civil service and its merit ~~systems~~system principles." 86 Fed. Reg. at 7231.

76. In 2024, the Biden Administration reiterated the importance of a nonpartisan, merit-based civil service. On April 9, 2024, OPM issued a final rule, *Upholding Civil Service Protections and Merit System Principles*, "to reinforce and clarify longstanding civil service protections and merit system principles." 89 Fed. Reg. 24982. The 2024 OPM Rule, which followed a 2023 NPRM, "better align[ed] OPM regulations with relevant statutory text, congressional intent, legislative history, legal precedent, and OPM's longstanding practice." *Id.*

77. The 2024 OPM Rule made three sets of regulatory changes. First, it clarified that career civil servants in the competitive or excepted service who have fulfilled their probationary or trial periods will retain their due process rights upon an involuntary move to a position that has fewer rights. The 2024 OPM Rule explained how career employees have established property interests in those rights that cannot be extinguished without due process.

78. Second, the 2024 OPM Rule clarified that the phrase "confidential, policy-determining, policy-making, or policy-advocating"—the language Congress used in 5 U.S.C § 7511(b)(2) to describe positions that are *excepted* from civil service protections—means noncareer, political appointments. The Rule explained how Congress and previous administrations have always (prior to the previous Trump Administration's Schedule F Executive Order ~~and OPM Memorandum~~) intended this term to refer to political appointees, not career officials.

79. Third, the 2024 OPM Rule established procedural requirements for moving positions to the excepted service and provided an appeals process for career employees when any such movement is involuntary and characterized as stripping individuals of their due process protections.

**The Government's Actions Unlawfully Discard Legal Protections ~~Requested by Previous Executives,~~ Enacted by Congress~~,~~ and Accepted by All Three Branches of Government**

17. The E.O. and OPM Memorandum will, in effect, reinstate a spoils system, untethered from merit.

80. The E.O.On his first day in office, President Trump put into motion the government actions at issue in this case. On January 20, 2025, he issued Executive Order No. 14171, "Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce." 90 Fed. Reg. 8625 (Jan. 20, 2025).

52.81. The Executive Order purports to amend 5 C.F.R. § 6.2 to create a new, broad category: "Career positions of a confidential, policy-determining, policy-making, or policy-advocating character not normally subject to change as a result of a Presidential transition." Amended E.O. § 4. (Citations to the "Amended E.O." are to the integrated E.O. from the first and second Trump administrations. (Letter from Charles Ezell, Acting Dir., U.S. Off. OfIntegrated E.O. § 4.[1] Pers. Mgmt., to Heads & Acting Heads of Departments & Agencies (Jan. 27, 2025) Guidance on Implementing President Trump's Executive Order titled, *"Restoring Accountability To Policy-Influencing Positions Within the Federal Workforce"*))

53.82. The purpose of this broad, new category of Schedule Policy/Career ("renewed Schedule F")P/C is plain from the text of the E.O.Executive Order – it will make it easier for the Administration to fire career civil servants by excepting them from the protections that Congress affordedestablished. *See* AmendedIntegrated E.O. § 1.

[1] Because the Executive Order purports to reinstate and amend Executive Order No. 13957, citations to the "Integrated E.O." are to the integrated E.O. from the first and second Trump Administrations, *see* Letter from Charles Ezell, Acting Dir., U.S. Off. of Pers. Mgmt., to Heads & Acting Heads of Departments & Agencies (Jan. 27, 2025), *Guidance on Implementing President Trump's Executive Order titled, 'Restoring Accountability To Policy-Influencing Positions Within the Federal Workforce*,' available at https://perma.cc/F6EY-EAE5 ("OPM Memorandum" or "OPM Mem.") at 7-13.

54.83. Under the terms of the E.O., these career civil servants would, if terminated, no longer have the right to receive notice or any reason at all as to why they are being terminated, and would no longer be provided an opportunity to be heard or to appeal their termination.

55.84. The workers subject to reclassification under the E.O. were chosenhired into their jobs on the basis of merit but will now face the specter of demotion, disciplinary actions, or dismissal on the basis of political allegiance or for other improper reasons, and without the recourse provided by existing civil service protections.

56.85. Disciplinary actions or dismissals of employees for ideological or political loyalty reasons will deprive the federal government of experienced, expert workers and undermine the efficient administration of government operations. Even the threat of such actions will cause some employees to withhold their honest views on government policies or actions or to otherwise not perform certain aspects of their jobs.[2]

57.86. The CSRA already provides for well-established and robust processes to remove federal employees who are insubordinate, perform poorly, or commit serious misconduct. *See* 5 U.S.C. §§ 4303; 7511-–15; 5 C.F.R. partpt. 432; 5 C.F.R. partpt. 752.

58.87. These provisions already allow removal of employees who resist or undermine policies and directives of political leadership. Nor does the E.O. seek to remove procedural

---

[2] Congress has made clear that it views the free and frank exchange of ideas among civil servants and between civil servants and political leadership as a key component of effective government. *See, e.g.*, 5 U.S.C. § 552(b)(5) (FOIA "deliberative process" exemption, exempting from disclosure under FOIA certain "inter-agency or intra-agency memorandums or letters"). In analyzing the legislative history of that exemption, the Supreme Court concluded that the point of the exemption "plainly made in the Senate Report, is that the 'frank discussion of legal or policy matters' in writing might be inhibited if the discussion were made public; and that the 'decisions' and 'policies formulated' would be the poorer as a result." *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975). Even independent of Congress's judgment, the Supreme Court has acknowledged that "temper[ing] candor" is "to the detriment of the decisionmaking process." *U.S. v. Nixon*, 418 U.S. 683, 705 (1974).

protections based on poor performance or failure to enact policy directives; it instead solely seeks to streamlinefacilitate terminations based on the type of work performed, and does not require any showing of poor performance, misconduct, or insubordination. But an employee's work portfolio – including whether they work on policy – has nothing to do with their performance or conduct.

59.88. Indeed, the E.O. purports to exclude affected workers from the purview of chapter 23, which prohibitsChapter 23's protections against prohibited personnel practices. These protections prohibit officials from, *inter alia*, making personnel recommendations based on political connections or influence, coercing employees into engaging in political activities, engaging in nepotism, or retaliating against whistleblowers. *See* 5 U.S.C. § 2302(b).

60.89. The E.O. directs agencies to establish rules similar to those in Chapter 23 regarding prohibited personnel practices, AmendedIntegrated E.O. § 6, but provides no timeline for agencies to do so, nor any recourse for employees denied such protections. And since the Executive Order permits agencies to terminate renewed Schedule FP/C employees without providing any basis, agencies are effectively free to fire workers for prohibited reasons – they just need not give any reason at all. Nor is it apparent why it makes sense to have separate agency procedures rather than blanket protections if the goal really is to provide protections.

61.90. Congress provided that workers should not be subject to discipline for "refusing to obey an order that would require the individual to violate a law, rule, or regulation." 5 U.S.C. § 2302(b)(9)(D). But far from recognizing employees' ultimate obligation to uphold the rule of law, the E.O. instead threatens employees with dismissal for failing to "faithfully implement administration policies to the best of their ability." AmendedIntegrated E.O. § 6(b).

62.91. This *carte blanche* to fire federal employees defies congressional mandates, leaving "innumerable ways for politics to factor into these traditionally merit-based decisions in a manner that would be difficult to detect or remedy." 89 Fed. Reg. at 24994.

92. Further, Section 4 of the E.O. directs OPM to "amend the Civil Service Regulations to rescind all changes made by [the 2024 OPM Rule] that impede the purpose of or would otherwise affect the implementation of" the E.O., while at the same time claiming that "[u]ntil such rescissions are effectuated (including the resolution of any judicial review)," the regulatory changes made by the 2024 OPM Rule "shall be held inoperative and without effect." 90 Fed. Reg. at 8626.

93. Finally, Section 5 of the E.O. directs OPM to "issue guidance about additional categories of positions that executive departments and agencies should consider recommending for Schedule Policy/Career." *Id.*

18. At the same time, the E.O. purports to remove competitive hiring processes which ensure that positions are filled by merit. *See* Amended E.O. §§ 1, 4.

**OPM Issues Guidance Regarding Schedule P/C Positions**

63.94. On January 27, 2025, OPM then-Acting Director Charles Ezell issued a Memorandum to heads and acting heads of departments and agencies, as required by the E.O.

64.95. The OPM Memorandum provides that "career positions will be rescheduled into Schedule Policy/Career and thereby exempted from the adverse action procedures set forth in chapter 75 of title 5 of the United States Code." OPM Mem. at 1.

65.96. The Memorandum further provides guidance to agencies about what positions should be included in renewed Schedule FP/C but emphasizes that this guidance is "not determinative." *Id.* at 2 34. Instead, agencies are encouraged to include positions "based on

additional characteristics not expressly specified" in the Executive orderOrder or OPM Memorandum. *Id*. at 4.

66.97. The OPM Memorandum directs agencies to identify positions to be transferred to renewed Schedule FP/C and to submit their initial "petitions to reschedule positions" to renewed Schedule FP/C "no later than SundayMonday, April 2021, 2025," encourages agencies to provide such submissions "on a rolling basis before this date," and explains that agencies will have an additional period to finalize and "submit any remaining petitions." *Id.* at 4–_5.

67.98. OPM explained that a new Executive Order will "effectuate the transfers" of positions to renewed Schedule FP/C. *Id.* at 4.

68.99. Just one day after issuing this Memorandum, OPM sent an email to virtually all federal employees confirming that the Administration intended to use the at-will employment status achieved by renewed Schedule FP/C as a tool to "downsize[]" "a substantial number of federal employees." Letter from U.S. Off. Ofof Pers. Mgmt. to Federal Employees (Jan. 28, 2025), *Deferred Resignation Email to Federal Employees,* https://tinyurl.com/yenpv2eeperma.cc/H5AE-RG8J.

**In short, OPM Issues Notice of Proposed Rulemaking to Implement Schedule P/C**

100. As directed by the E.O.., on April 23, 2025, OPM published a NPRM, "Improving Performance, Accountability and Responsiveness in the Civil Service", 90 Fed. Reg. 17182.

101. The proposed rule claims that its purpose is "to strengthen employee accountability and the democratic responsiveness of American government, while addressing longstanding performance management challenges in the Federal workforce." *Id.* OPM Memorandum

~~abrogate~~The NPRM proposes to undo the amendments from the 2024 OPM Rule, thereby allowing career employees to be moved into Schedule P/C and stripped of their due process protections.

102. OPM initially provided a 30-day public comment period, with the comment period originally scheduled to close on May 23, 2025. On May 21, 2025, OPM extended the comment period by 15 days, with an updated comment close date of June 7, 2025.

103. Plaintiffs AFGE and AFSCME submitted a joint comment, thoroughly explaining how OPM's articulated basis for its proposed rule is not grounded in fact or sound reasoning, how it is contrary to the CSRA, and how it would undermine the merit-based, career civil service and harm the American public. AFGE & AFSCME Comment on Proposed Rule on Improving Performance, Accountability and Responsiveness in the Civil Service (June 6, 2025), https://perma.cc/5TJB-L4J5. AFGE's and AFSCME's comment also detailed how the proposed rule would deprive their members of due process, interfere with their liberty interests in pursuing their chosen profession, and result in arbitrary and capricious agency conduct.

104. Plaintiff AFL-CIO submitted a comment, addressing in detail the lack of evidentiary support for the proposed rule, OPM's failure to sufficiently weigh the costs of its proposal, and OPM's failure to adequately consider more targeted alternative approaches, among other shortcomings. AFL-CIO Comment on Proposed Rule on Improving Performance, Accountability and Responsiveness in the Civil Service (June 11, 2025), https://perma.cc/R9LT-TSKR.

105. Plaintiff PEER also submitted a comment, extensively describing the inadequate basis of the proposed role and the extensive harms that would result from it, including, among others, loss of expertise in the federal government, increased retaliation, and reduced whistleblowing, and harm to federal grantmaking. PEER Comment on Proposed Rule on

Improving Performance, Accountability and Responsiveness in the Civil Service (June 5, 2025), https://perma.cc/37QW-G46X. PEER's comment also explained how OPM's proposed rule would result in direct harm to PEER and the individuals it represents.

106. Over 40,000 comments were submitted during the public comment period. As OPM itself acknowledged, 94% of those comments were opposed to the proposed rule. Improving Performance, Accountability and Responsiveness in the Civil Service, 91 Fed. Reg. 5580, 5581 (Feb. 6, 2026).

**OPM Issues Final Rule to Establish Schedule P/C**

107. On February 6, 2026, OPM published the Final Rule at issue in this case. The Final Rule makes several regulatory changes to implement Schedule P/C and to unwind the amendments from the 2024 OPM Rule. (The Executive Order purported to render some of the changes from the 2024 OPM Rule "inoperative and without effect," but the Executive Order's assertion that these changes could be effectuated without notice-and-comment rulemaking was incorrect.)

108. First, the Final Rule amends OPM's regulations to include Schedule P/C "as an excepted service schedule for career positions of a confidential, policy-determining, policy-making, or policy-advocating character." 91 Fed. Reg. at 5580. Because such positions—which the Final Rule calls "policy-influencing" as shorthand—are exempt from statutory due process protections, 5 U.S.C. § 7511(b)(2), and prohibited personnel practice protections, 5 U.S.C. § 2302(a)(2)(B)(i), the Final Rule makes clear that career employees who are moved into Schedule P/C will lose these protections.

109. Second, the Final Rule removes amendments made by the 2024 OPM Rule which provided that career employees who have accrued due process protections but who are involuntarily moved into a position lacking such protections would retain them. Under the Final

Rule, employees who had acquired due process protections but who are moved into Schedule P/C would lose those protections—thus being subject to removal or any number of arbitrary actions with no recourse.

110. Third, the Final Rule removes additional amendments made by the 2024 OPM Rule which imposed procedural requirements on any movement of positions into a new excepted service schedule (like Schedule P/C) and provided any employee whose position was moved with a right to challenge that move at the MSPB to the extent it purported to strip them of their due process protections. Under the Final Rule, the President can move any positions he chooses into Schedule P/C, no procedural requirements apply, and employees do not have a right to challenge those moves at the MSPB.

111. The Final Rule does not itself move any positions into Schedule P/C. Instead, OPM will review submissions from agencies regarding which positions to move, will make recommendations to the President, and "the President will make the final decision about which positions go into Schedule Policy/Career. That decision will be effectuated by a new executive order issued under Presidential—not OPM—authority." 91 Fed. Reg. at 5585.

112. This means that it is impossible for OPM to know how many positions will actually be moved into Schedule P/C. Yet the Final Rule nonetheless claims that OPM's prior estimate (from the NPRM) of 50,000 positions is correct: "Having conducted initial review of agency recommendations for Schedule Policy/Career conversions, OPM can state that its initial estimate of 50,000 positions was a reasonable approximation of potential conversions." 91 Fed. Reg. at 5606. OPM claims that 50,000 federal employees is merely a "modest level of affected employees" and that it is interpreting the "policy-influencing" exception from due process protections "narrowly."

113. OPM has no way to know whether the President will try to strip due process protections from 50,000 federal employees or magnitudes more, but, regardless, this radical change is hardly "modest," and the lack of any limiting principle as to which positions the president can move (both now and in the future) effectively means the entire career civil service is at risk.

114. Throughout the Final Rule, OPM claims that employees who are moved into Schedule P/C and who continue to perform well have nothing to worry about. The Final Rule even goes so far as to say that President Trump values career civil servants: "Commenters overlook the many times the President has praised and lauded Federal employees as a whole, including in public proclamations." 91 Fed. Reg. at 5611. OPM offers two (and only two) cites for point: (1) a 2018 formal proclamation recognizing Public Service Recognition Week, and (2) President Trump's comments from 2018 supporting ICE agents and attacking protestors. 91 Fed. Reg. at 5611 & nn.254–255.

115. But the Trump-Vance Administration's rhetoric and actions illustrate the absurdity of OPM's "assurances" that Schedule P/C employees have nothing to worry about.

116. Indeed, on the same day that he issued the Executive Order, President Trump declared his desire to fire career civil servants that had been hired during the Biden Administration, stating that "[m]ost of those bureaucrats are being fired – they're gone. It should be all of them." Erich Wagner, *Trump: Agencies Should Fire "All" Bureaucrats*, Government Executive (Jan. 20, 2025), https://perma.cc/72PR-33PJ. As he signed the Executive Order, President Trump reiterated that he was "getting rid of all the cancer, the cancer caused by the Biden administration." Alan Rappeport, *Federal Employees Union Sues Trump Over Worker Protections*, N.Y. Times (Jan. 21, 2025), https://perma.cc/5PAY-2GC6.

117. Future Vice President Vance advised President Trump to "[f]ire every single midlevel bureaucrat, every civil servant in the administrative state, replace them with our people." Andrew Prokop, *J.D. Vance's Radical Plan to Build a Government of Trump Loyalists*, Vox (July 18, 2024), https://perma.cc/B7BB-PND2.

118. The Director of the Office of Management and Budget ("OMB"), Russell Vought, publicly stated in 2024: "We want bureaucrats to be traumatically affected. When they wake up in the morning, we want them to not want to go to work because they are increasingly viewed as the villains." Molly Redden, Andy Kroll, & Nick Surgey, *"Put Them in Trauma": Inside a Key MAGA Leader's Plans for a New Trump Agenda*, ProPublica (Oct. 28, 2024), https://perma.cc/ZZZ3-6N59.

119. OPM Director Kupor, the same day that OPM issued its Final Rule, proclaimed, "There's no such thing as lifetime employment." Robin Bravender, *OPM boss to feds: Don't expect jobs for life*, PoliticoPro (Feb. 5, 2026), https://perma.cc/G9US-562Z.

120. That same day, Director Kupor issued a Memorandum to agency heads, "Initial Implementing Guidance for Schedule Policy/Career Final Rule (*Improving Performance, Accountability and Responsiveness in the Civil Service*)." That memorandum, which purported to "provide[] important guidance to Federal agencies implementing OPM's Final Rule," included a "template notice that agencies may adapt to" notify employees who are reclassified to Schedule P/C. *Id.*, 1, 4.

121. That template notice, as drafted, would require employees to sign a statement that they understand that: 1) they will be in the excepted service; 2) their service will be at-will; 3) their position will not have appeal rights to the MPSB; 4) their agencies will enforce prohibited

personnel practices; and 5) these terms are "conditions of [their] continued employment." *Id.*, App'x. 4.

122. ~~that~~ Since taking office, the Trump Administration has backed this rhetoric with action. It has fired dozens of federal employees who have expressed concerns or made whistleblower allegations about violations of law or fraud, waste, and abuse; has encouraged career employees to quit; has substantially reduced the size of the federal workforce; and has used the October 2025 government shutdown to illegally attempt to fire thousands of additional workers.

123. Especially relevant here, the Trump Administration fired thousands of probationary employees—career employees who were in their first or second year of federal service and had not yet accrued due process protections. The Administration did not fire them based on any assessment of their performance or conduct, but instead solely because those workers lacked due process protections—precisely the case for Schedule P/C employees.

124. Any claim that the Trump Administration does not intend to take the exact same approach with Schedule P/C employees is belied by the Administration's actions to date. The problem for the Trump Administration, however, is that Schedule P/C is illegal for multiple reasons.

**Schedule P/C Is Contrary to Statute and Dramatically Expands Congress' Narrow Exclusions From Civil Service Protections**

125. Schedule P/C is unlawful because it is contrary to statute and an attempt to undermine Congress's design. Congress has said, time and again, that career civil servants should be retained based on merit and protected from arbitrary treatment. The EO and the Final Rule turn that design on its head.

126. The Final Rule repeatedly claims that Chapter 75 and Chapter 43 removals—the mechanisms by which agencies may demote or remove a career civil servant for reasons related to

conduct or performance—are too difficult and that Schedule P/C provides a solution: "The creation of Schedule Policy/Career offers a comprehensive solution to the government-wide problems created by the lengthy and litigious nature of the current removal procedures, at least with respect to policy influencing-positions." 91 Fed. Reg. at 5589. But even if OPM adequately established the premise that statutory removal procedures harm the federal government (it has not), it is up to Congress, not OPM, to change those procedures.

127. Congress has crafted narrow exclusions from civil service protections for limited categories of employees, including those who are Senate confirmed; were appointed directly by the president; members of the Foreign Service, the Central Intelligence Agency and several other specifically identified agencies; non-citizens who occupy positions outside of the United States; and, as relevant here, whose positions are "of a confidential, policy-determining, policy-making or policy-advocating character." 5 U.S.C. §§ 7511(b)(1)–(10); *see also* 5 U.S.C. § 2302(a)(2)(B).

128. Congress intended this exception to apply only to political appointees, not career officials. Since the CSRA was enacted in 1978, administrations have treated this exception as synonymous with "Schedule C," the excepted service schedule used for political appointees, and have limited this exception to fewer than 2,000 employees, less than 0.1 percent of the federal workforce. *See* U.S. Civ. Serv. Comm'n, *Maintaining the Integrity of the Career Civil Service*, 10 (1960); U.S. Off. of Pers. Mgmt., *General, Questions and Answers*, https://perma.cc/CVQ9-ESY9 (last visited Mar. 3, 2026) (detailing different political appointment types); Ctr. for Presidential Transition, *Frequently Asked Questions About the Political Appointment Process*, P'ship for Pub. Serv., https://perma.cc/75NU-Z7ZS (last accessed Jan. 16, 2025).

129. Broadening this exception to include career employees cannot be squared with the text and structure of the CSRA. For example, the CSRA created the "Senior Executive Service to

ensure that the executive management of the Government of the United States is responsive to the needs, policies, and goals of the Nation." 5 U.S.C. § 3131. As OPM recently noted in a different rulemaking, "[t]he Senior Executive Service (SES) is a corps of top-level Federal executives who provide leadership and oversee government operations, bridging the gap between political appointees and career civil servants." *Assuring Responsive and Accountable Federal Executive Management*, 90 Fed. Reg. 18820 (May 2, 2025). Career SES, by statute, "exercise[] important policy-making, policy-determining, or other executive functions," 5 U.S.C. § 3132(a)(2)(E)—yet Congress explicitly provided adverse action and protections from prohibited personnel practices to career members of the SES, with *no exception* based on the type of work they perform. It makes no sense that Congress would provide adverse action protections to career SES, with no exceptions, while giving the president the ability to strip those protections for a lower-ranking level of civil servants who work on policy and who are less directly accountable to the President. 91 Fed. Reg. at 5599 ("SES members will not be included in Schedule Policy/Career because they are appointed to a service separate and distinct from the competitive and excepted services."). Multiple commenters made this argument; OPM offered no meaningful response.

130. The exception for employees whose positions are of a "confidential, policy-determining, policy-making or policy-advocating character" in 5 U.S.C. § 7511(b)(2) and 5 U.S.C. § 2302(a)(2)(B) is limited to employees who do not have an expectation of continued employment after the presidential administration in which they serve. Congress has consistently and repeatedly used this phrase to refer to political appointees. *See, e.g.*, 5 U.S.C. § 9803(c)(2)(A); 6 U.S.C. § 349(d)(3)(B); 7 U.S.C. § 6992(e)(2)(D); 38 U.S.C. § 725(c)(1). Commenters pointed to these statutes, but OPM again failed to meaningfully consider them.

131. Congress has also used this phrase in ways that only makes sense if it applies to political appointees and not career employees. Those occupying "confidential, policy-determining, policy-making, or policy-advocating" positions are statutorily excluded from student loan repayment programs, 5 U.S.C. § 5379(a)(2); bonus awards, 5 U.S.C. § 5402(2)(vi); recruitment, retention, or relocation incentives, 5 U.S.C. §§ 5753(a)(2)(C), 5754(a)(2)(C); payments for academic degree training, 5 U.S.C. § 4107(b)(3)(B); and local government exchange programs, 5 U.S.C. § 3372(a)(1). Commenters also pointed to these statutes. And, again, OPM failed to meaningfully consider them.

132. Were positions "of a confidential, policy-determining, policy-making or policy-advocating character" expanded to include career employees, it would undercut the CSRA, which establishes protections for career employees in the competitive, excepted, and Senior Executive Services.

133. Yet that is exactly what the E.O. and OPM Final Rule do and what the forthcoming executive order or orders that reclassify positions into Schedule P/C and any subsequent OPM implementation will do. Schedule P/C uses a narrow statutory exception from civil service protections—an exception that Congress intended to apply *only* to political appointees—and dramatically broadens that exception to apply to a broad swath of career employees.

**The President and OPM Lack Authority to Strip Procedural Protections from Civil Servants Without Due Process**

134. The E.O. and OPM Final Rule purport to strip due process protections from current career civil servants en masse, allowing employees placed onto Schedule P/C to be fired at will and without procedural protections such as notice and an opportunity to be heard. The forthcoming executive order or orders reclassifying positions into Schedule P/C and any additional OPM implementation of Schedule P/C will effectuate the stripping of due process protections.

135. But once federal employees obtain due process protections, they retain them—even if their positions are reclassified into positions no longer eligible for those protections, as the Constitution prohibits the government from stripping that interest without due process of law. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985); U.S. Const. amend. V.

136. Here, Congress created conditions under which excepted and competitive service employees with the requisite satisfactory tenure earn a property interest in that continued employment. For such employees, Congress has mandated that removal and the other actions described in title 5 may be taken only "for such cause as will promote the efficiency of the service." *See* 5 U.S.C. §§ 7503(a), 7513(a); 5 C.F.R. §§ 752.102(a), 752.202(a).

137. This property interest in continued employment has existed in the civil service since at least 1912, when the Lloyd-La Follette Act required just cause to remove a federal employee. *See Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 576–77 (1972); 89 Fed. Reg. at 24987.

~~69.~~138. The Constitution divests the president of authority to terminate employees' accrued property interests in continued employment, and their concomitant due process protections, simply by converting them from one federal civil service category to another. *See Roth v. Brownell*, 215 F.2d 500, 502 (D.C. Cir. 1954). "Neither the formula of 'excepting' the kind of position a person holds, nor any other formula, can obviate the ~~to protect against partisan encroachment into hiring and~~ requirement[s]" for firing ~~decisions~~a civil servant. *Id*.

139. ~~**Renewed Schedule F**~~The OPM Final Rule incorrectly claims that the Administration's reclassifications into Schedule P/C are "'legislative' actions, not 'adjudicative,' for purposes of constitutional due process." 91 Fed. Reg. at 5628. But even if this rule is "legislative," that does not immunize it. While it is true that "*the legislature* which creates a property interest may rescind it" because "the legislative process itself provides citizens with all

of the 'process' they are 'due,'" *Gattis v. Gravett*, 806 F.2d 778, 781 (8th Cir. 1986) (emphasis added) (citing *Atkins v. Parker*, 472 U.S. 115, 131 (1985)), Congress has neither enacted legislation to cabin the property interests it created through the CSRA, nor authorized Defendants to strip these vested protections by executive fiat, *see Roth*, 215 F.2d at 502. Accordingly, assuming *arguendo* that the Final Rule is legislative in nature, the OPM Final Rule is contrary to law.

**Schedule P/C and the OPM Final Rule are Arbitrary and Capricious**

140. The OPM Final Rule is further unlawful because it is arbitrary and capricious for many reasons noted above and below, including but not limited to that it is not supported by the record, does not engage in reasoned decision-making, fails to take into account reliance interests, relies on information not in the record, does not adequately respond to public comments, and does not adequately justify a change in position from the 2024 OPM Rule.

141. The primary basis for the Final Rule is the allegation that statutorily mandated removal procedures in Chapter 75 and Chapter 43 are lengthy, litigious, and inadequate, and therefore, these procedures should not apply to federal employees with "policy-influencing" responsibilities. As an initial matter, the record on which the Final Rule relies does not support the conclusion that "existing authorities leave agencies unable to effectively address poor performance, misconduct, and corruption." 91 Fed. Reg. at 5585. But even holding aside the paucity of evidence supporting OPM's general proposition, there remains a complete mismatch between the basis for the Rule—removal procedures being inadequate to address performance and conduct issues—and the solution of Schedule P/C—stripping due process protections based on the *type of work* that employees perform, not on how well they perform it.

142. The Final Rule's examples of performance and misconduct issues prove the point. For instance, OPM relies heavily on an independent auditor's report of conditions at the Federal Deposit Insurance Corporation ("FDIC"), where OPM claims "a fear of litigation contributed to tolerance of rampant sexual misconduct committed by senior officials." 91 Fed. Reg. at 5588. In its NPRM, OPM asserted that the auditor's report found that "adverse action procedures and appeals were a major reason" for a lack of accountability and that "[a]dverse action procedures made it difficult" to hold employees accountable. 90 Fed. Reg. at 17190. As Plaintiffs AFGE and AFSCME pointed out in their comment, however, the auditors did not specifically fault adverse action procedures or appeals and in fact made no such finding. AFGE & AFSCME Comment on Proposed Rule at 3. Moreover, neither the NPRM nor the Final Rule ever say what the relevant adverse action procedures at the FDIC actually are, or if the offending FDIC employees were even covered by Chapters 75 and 43 of Title 5. Nor does OPM argue that the offending FDIC employees were "policy-influencing" and would have been moved to Schedule P/C such that they could be quickly and summarily terminated. There is simply no connection between the evidence that OPM relied on and the agency's response in adopting Schedule P/C.

143. OPM also relies heavily on a report from the American First Policy Institute entitled *Tales from the Swamp*, which was authored by James Sherk, a current (and former) Trump White House official who is widely credited with conceiving of the former Schedule F (and current Schedule P/C). *E.g.*, 91 Fed. Reg. at 5622–23. The NPRM and the Final Rule both rely on a portion of the report that alleges that a career General Services Administration (GSA) lawyer leaked an executive order to the press. But the report says that the career lawyer resigned, raising the question as to why weakened removal procedures were needed. And the Final Rule claims that "only a

minority of attorneys are likely to be reclassified into Schedule Policy/Career," 91 Fed. Reg. at 5606, so it is not even clear that this attorney would have been in Schedule P/C.

144. Moreover, in responding to public comments pointing out that there is no direct evidence that the GSA lawyer leaked the executive order, OPM relies on information that is not in the record (and makes clear its view of due process): "OPM has also discussed this report with an official from the first Trump Administration who was familiar with the situation. That official verified the accuracy of the America First Policy Institute's reporting of the incident." 91 Fed. Reg. at 5622.

145. In fact, the Final Rule regularly and improperly relies on the views of Trump Administration political appointees as support. The Final Rule claims that agencies "reported to OPM that adverse action procedures make it very difficult for them to remove poor performers, and this is a significant problem." 91 Fed. Reg. at 5586. The Final Rule "credits these comments," because "[a]gencies know what is occurring in their workforces and are best positioned to evaluate challenges impacting them." *Id.* Holding aside that these comments relate to performance management more generally, and have little if anything to do with policy-influencing employees specifically, the "agency" comments are submitted by high-level Trump Administration political appointees (except in one instance, in which a comment purportedly from the Department of Veterans Affairs is on unmarked paper, with no letterhead and no signature, and no indication whatsoever that it is an "agency" comment). *See* Comment from VA (June 11, 2025), https://perma.cc/K995-W729. OPM's reliance on these comments is misplaced and tautological: the Trump Administration supports Schedule P/C because the Trump Administration supports Schedule P/C.

146. Much of the evidence on which the Final Rule relies is even weaker. As one example, the Final Rule responds to numerous commenters' observations that OPM had "failed to provide evidence of widespread policy resistance" among civil servants in part by pointing to a single, anonymous comment from someone purporting to be a federal employee and alleging to have seen unspecified employees at an unspecified agency take unspecified steps at some unspecified point in the past to thwart unspecified policy initiatives of an unspecified administration. 91 Fed. Reg. at 5591; Comment from Anonymous (May 27, 2025), https://perma.cc/6GS3-V4LT; *see also* 91 Fed. Reg. at 5623 & n.289 (again citing this comment as the sole support for the claim that "[s]ome Federal employees also commented on the rule and told OPM that policy-resistance 'is a real thing'").

147. As another example, the Final Rule points to state governments that have converted parts of their career workforce to "at-will" employees and claims that "commenters point out that evidence shows these reforms have been beneficial and concerns about a return to the spoils system have not materialized." 91 Fed. Reg. at 5621. The Final Rule cites to, among others, "Commenters 17824, 19350, [and] 19352" as support for this point. *Id.* But these three comments, which are identical, say only, with no further support, "States like Georgia, Florida, and Arizona have already reformed their public workforces to adopt at-will models with no evidence of political abuse."[3] This is the type of "evidence" on which OPM relies.

[3] Comment from Mike Fernando on the Final Rule of Improving Performance, Accountability and Responsiveness in the Civil Service, OPM (May 21, 2025), https://perma.cc/APN8-2PL2; Comment from Ted Burton on the Final Rule of Improving Performance, Accountability and Responsiveness in the Civil Service, OPM (May 22, 2025), https://perma.cc/JMH6-7LVM; Comment from Kelly Boyce on the Final Rule of Improving Performance, Accountability and Responsiveness in the Civil Service, OPM (May 22, 2025), https://perma.cc/RE29-LB9D.

148. Not only that, but OPM relies on these exact comments to justify changing its prior position. In OPM's 2024 Rulemaking, OPM considered multiple comments that pointed to evidence "that state-level reforms to weaken civil service protections have not delivered the benefits they promised and may well dampen enthusiasm for similar initiatives." 89 Fed. Reg. at 24998 (brackets and quotation marks omitted). In its Final Rule, OPM now discounts this evidence based on nothing more than "reconsideration and reviewing comments 17824, 19350, [and] 19352." 91 Fed. Reg. at 5621.

149. The Final Rule's discussion of reliance interests—including the reliance interests that were created from the 2024 OPM Rule—is similarly inadequate. As to career employees "who have invested in agency-specific expertise on the premise they would possess adverse action and procedural protection rights, i.e. job security," OPM dismisses their reliance interests because "fully successful employees know they have little need of [those protections]." 91 Fed. Reg. at 5646. Relatedly, OPM says that employees "who fail to perform adequately or who engage in serious misconduct" have no "legitimate reliance interest" in these protections because their only threatened interest is "the ability to violate merit principles with little risk of removal." *Id.* But OPM's arguments here ignore a foundational purpose of due process protections: the chance to address and correct mistaken accusations and demonstrate that one is in fact a successful employee. OPM's argument is akin to saying there is no legitimate reliance interest in holding criminal trials because the innocent have no need for them and the accused are already guilty. Based on that error, the Final Rule dismisses an entire category of real and legitimate reliance interests.

150. Still further, the Final Rule concludes that federal employees do not place a high value on due process protections based on a Congressional Budget Office estimate "that roughly one quarter of affected federal hires would choose to contribute an additional 5 percent of their

salary toward retirement rather than enter into at-will employment." Congressional Budget Office, *Cost Estimate, Reconciliation Recommendations of the House Committee on Oversight and Government Reform* at 6–7 (May 13, 2025), https://perma.cc/TU3M-C5GR (cited at 91 Fed. Reg. 5646, 5648 n.495). As an initial matter, this conclusion is based on unspecified "data about employees' perceptions of job security and willingness to forgo current compensation for future benefits," making it impossible for commenters to respond to the estimate. *See id.* But even taking it at face value, that a quarter of federal employees would place such high value on due process protections demonstrates that those protections *are* important and implicate substantial reliance interests.

151. The Final Rule also fails to adequately respond to significant points raised by commenters, including Plaintiffs. For example, Plaintiff AFL-CIO explained in its comment that Defendants needed to consider the degree to which the stated need for Schedule P/C may be undermined by other Trump Administration initiatives—in particular, an ongoing rulemaking that is similarly directed at facilitating the removal of career civil servants. AFL-CIO Comment on Proposed Rule at 5–7 (citing Suitability and Fitness, 90 Fed. Reg. 23467 (June 3, 2025)). The Final Rule utterly failed to do so. As another example, Plaintiff PEER explained how the loss of due process protections means that professional civil servants "will fear retaliation if they deliver potentially bad news, whether it be agricultural production statistics, severe weather forecasts, economic trends," or the like, and "[t]his will leave the nation unprepared to respond and adapt to foreseeable unfavorable events." Here too, the Final Rule failed to meaningfully respond to this point. To give another example, commenters advised OPM of its obligation to "disclose information related to any use of artificial intelligence as part of this rulemaking." Comment from Governing for Impact at 14–15 (May 27, 2025), https://perma.cc/MJY2-2EM6. The Final Rule—

like the NPRM—provides no description of Defendants' use of artificial intelligence during the rulemaking.

**Schedule P/C Is Not Warranted by Good Administration**

~~70.~~152. ~~The E.O. asserts~~The E.O. and the OPM Final Rule are further unlawful because they assert that the removal of civil service protections is necessary and warranted by good administration as required by 5 U.S.C. § 3302, but the opposite is true. The forthcoming executive order or orders reclassifying positions into Schedule P/C, along with any OPM implementation of the reclassification, also violate 5 U.S.C. § 3302 because they are neither necessary nor warranted by good administration.

**Prior Government Actions Reflect that Only Narrow Exceptions to the Competitive Service are Necessary to Promote Good Administration**

~~71.~~153. Prior determinations to except narrowly-defined groups from the competitive service demonstrate that ~~renewed~~ Schedule ~~F~~P/C is an aberration—it is neither necessary nor warranted by good administration. In adopting prior exceptions to the competitive service, the president or OPM carefully considered the necessity of such exceptions, tailoring new schedules and exceptions to the specific factual circumstances that required deviating from the default of competitive service.

~~72.~~154. For example, in 2009, OPM conducted a review of the government's ability to recruit and hire students and recent graduates. This review included an interagency team to examine relevant federal recruiting and hiring processes, public hearing and invitation for comments on the necessity for an exception to competitive service, review of scholarly literature and empirical data, expert analysis, and a report from OPM to the president. *See generally* Excepted Service, Career and Career-Conditional Employment; and Pathways Programs, 76 Fed. Reg. 47495, 47496~~-~~–97 (Aug. 5, 2011) (describing review).

~~73.~~155. President Obama subsequently issued Executive Order No. 13562, creating Schedule D, which excepted certain students and recent graduates temporarily from the competitive service. Relying on OPM's report, the President articulated the necessity of these new exceptions in light of identified barriers to employment, the benefits recent graduates provide to the federal workforce, and the merit system principle set forth in 5 U.S.C. § 2301(b)(1) for the federal government "to achieve a ~~work force~~ workforce [from] all segments of society." ~~*See* Executive Order~~ Recruiting and Hiring Students and Recent Graduates~~No. 13562~~, 75 Fed. Reg. ~~82,585~~82585 (Dec. ~~30~~27, 2010). Also of note, this exception was used to increase access to federal employment, not restrict it.

~~74.~~156. Other competitive service exceptions, unlike the E.O. and Final Rule here, were tied to specific and narrow factual circumstances that made ~~deviating~~limited deviations from the competitive service necessary.

~~75.~~157. In 2023, as explained above, OPM engaged in notice-and-comment rulemaking to decide how best to "enhance the efficiency of the Federal civil service and promote good administration." Upholding Civil Service Protections and Merit System Principles, 88 Fed. Reg. 63862~~-01~~, 63863 (Sept. 18, 2023).

~~76.~~158. As part of this process, OPM received and reviewed extensive submissions, including by ~~Plaintiff.~~Plaintiffs PEER, AFGE, and AFSCME. More than 4,000 commenters weighed in, including from "a variety of individuals (including current and former civil servants), organizations, and Federal agencies." 2024 OPM ~~Final~~ Rule, 89 Fed. Reg. at 24984.

~~77.~~159. In addition to carefully considering these comments, OPM reviewed scholarly literature and empirical studies, analyzed the history of the civil service, and examined Congress' frequent statutory actions in this space. *See generally id.*

~~78.~~160. Following this comprehensive process, OPM concluded that strengthening and clarifying civil service protections—not removing them, as ~~proposed by~~ the E.O.~~—~~. and Final Rule do—would promote good administration.

~~79.~~161. For example, the ~~Final~~2024 OPM Rule cataloged existing and effective mechanisms for "appropriate management oversight" of employees. 89 Fed. Reg. at 24990; *id.* at 24995–96.

~~80.~~162. The 2024 OPM Rule also evaluated empirical studies and literature relating to state and international efforts to remove civil service protections, concluding that removing civil service protections did not improve performance or the delivery of government services. *See* 89 Fed. Reg. at 24998, 25002–03. The 2024 OPM Rule concluded that instead of ensuring accountability and effective government, the evidence confirmed that Schedule F would open the door to partisan hiring and firing that risks ushering in the return of the spoils system that Congress has long sought to stamp out. Civil service protections are strongly associated with better government administration, including improved government performance, more effective delivery of services, and reduced corruption. *Id.* at 25002–05. Excepting such workers from the competitive service would "inject[] politicization into the nonpartisan career civil service" and "would not only harm government employees, agencies, and services, but also the American people that rely on them." *Id.* at 24995.

~~**Social Science Confirms that the Merit Protections and Procedural Safeguards Targeted by the Executive Order Promote Government Performance**~~

~~19. Extensive social science research confirms that renewed Schedule F is neither necessary nor warranted by good government administration.~~

~~20. For example, a meta-analysis looking at the impact of merit principles examined nearly 100 peer-reviewed studies across more than 150 countries. The analysis showed that use of~~

~~merit principles and tenure protection for civil servants was positively and consistently associated with government performance and negatively associated with corruption. *See* Eloy Oliveira et al., *What Does the Evidence Tell us about Merit Principles and Government Performance?*, 102 Pub. Admin. 668, 683 (2023), https://tinyurl.com/2xcpf7x9.~~

~~21. Other studies confirm the importance of civil service protections for the effective delivery of government services, including that adopting civil service reforms reduced errors and increased productivity. *See* Abhay Aneja & Guo Xu, *Strengthening State Capacity: Civil Service Reform and Public Sector Performance during the Gilded Age*, 114 Am. Econ. Rev. 2352 (2023), https://tinyurl.com/mn8jcnu4.~~

~~22. Social science research confirms reduced merit protections drive experts out of government and make it harder to recruit motivated, effective workers. *See* Mark D. Richardson, *Politicization and Expertise: Exit, Effort, and Investment*, 81 J. Pol., 878-891 (2019).~~

~~**History Reflects that Renewed Schedule F is Neither Necessary Nor Warranted by Conditions of Good Administration**~~

~~23. Since 1883, career civil servants have conducted the business of government for the American people in a non-partisan manner.~~

~~24. They have advised incoming administrations regardless of party affiliation, carried out presidential priorities and Congress' programs, all while ensuring the timely delivery of public benefits to the countless Americans who depend on them.~~

~~25. This was as true under President Trump as it was for his predecessors.~~

~~26. If this E.O. and the OPM Memorandum stand, future administrations are unlikely to retain employees chosen on the basis of political loyalty to a predecessor and will likely seek to replace them. "[W]hen a man has not been appointed by reason of his fitness, he must not ask that he be retained on account of his merit. . . . It treats the public service as a huge soup-house, in~~

which needy citizens are to take turns at the table, and they must not grumble when they are told to move on." *The Reform of the Civil Service*, 17.

27. The E.O. and OPM Memorandum will resurrect quadrennial "public scrambles" for appointment to a vast swath of federal posts, undermining government efficiency at times of presidential transition.

**The Executive Order and OPM Memorandum Dramatically Expand Congress' Narrow Exclusions From Civil Service Protections**

81.1. Congress has crafted narrow exclusions from civil service protections for limited categories of employees, including those who are Senate confirmed; whose positions are "of a confidential, policy-determining, policy-making or policy-advocating character" (who are listed on Schedule C); were appointed directly by the president; members of the Foreign Service, the Central Intelligence Agency and several other specifically identified agencies; non-citizens who occupy positions outside of the United States; and some retired annuitants. 5 U.S.C. §§ 7511(b)(1)-(10). *See also* 5 U.S.C. § 2302(a)(2)(B).

28. Since the CSRA was enacted in 1978, administrations have limited Schedule C exceptions to fewer than 2,000 employees, less than 0.1 percent of the federal workforce. *See* U.S. Civ. Serv. Comm'n, *Maintaining the Integrity of the Career Civil Service*, 10 (1960); U.S. Off. Of Pers. Mgmt., *General, Questions and Answers*, https://tinyurl.com/y8wtp9yk (last visited Jan. 16, 2025) (detailing different political appointment types); Ctr. for Presidential Transition, *Frequently Asked Questions About the Political Appointment Process*, P'ship for Pub. Serv., https://tinyurl.com/yeyph42y (last accessed Jan. 16, 2025).

29. Just 0.02% of the federal workforce, roughly 4,000 people, serve as political appointees, including Senate-confirmed, presidentially appointed, and Schedule C officials.

~~30. The exception for employees whose positions are "of a confidential, policy-determining, policy-making or policy-advocating character" in 5 U.S.C. § 7511(b)(2) and 5 U.S.C. § 2302(a)(2)(B) is limited to employees who do not have an expectation of continued employment after the presidential administration in which they serve. *See, e.g.*, 5 U.S.C. § 9803(c)(2)(A); 6 U.S.C. § 349(d)(3)(B); 7 U.S.C. § 6992(c)(2)(D); 38 U.S.C. § 725(c)(1).~~

~~31. Congress has also used the phrase "confidential, policy-determining, policy-making or policy-advocating character" ways that only makes sense in the context of non-career (e.g., political) employees, including to exclude appointees from bonuses or other programs designed for the benefit of the career workforce. *See, e.g.*, 5 U.S.C. §§4107(b)(3)(B) (excluded from payments for academic degree training), 5379(a)(2) (excluded from student loan repayments), 5402(2)(vi) (excluded from bonus); 5 U.S.C. § 3372(a)(1) (excluded from local government exchange programs).~~

~~82.~~1. ~~Were positions "of a confidential, policy-determining, policy-making or policy-advocating character" expanded to include career employees, it would undercut the CSRA, which establishes protections for both competitive and excepted service employees.~~

~~32. Yet that is exactly what the E.O. and OPM Memorandum seek to do, including for entry-level and mid-level employees. Based on the actions of agencies in the first administration of President Trump and statements from OPM during this administration that agencies are likely to reclassify to at-will status "a substantial number of federal employees," entry-level and mid-level employees such as GS-9 and GS-10 employees will be classified as excepted from the competitive service under renewed Schedule F.~~

**~~The Executive Order and OPM Memorandum are Aimed at Politicizing the Civil Service, and Any Claimed Benefits to Good Administration are Pretext~~**

~~33. President Trump and his surrogates have made clear that renewed Schedule F, far from being a tool to drive effective government and improve performance, is based on a desire to drive out career civil servants, including those who may not share his politics, and to expedite the process of hiring political loyalists into positions previously staffed on the basis of merit.~~

~~34. President Trump stated that he seeks to make "every executive branch employee fireable by the president of the United States. The deep state must and will be brought to heel." Donald J. Trump, Speech at Political Rally in Florence, South Carolina (March 12, 2022), https://tinyurl.com/3k6km35w.~~

~~35. The President has pledged to fire wide swaths of civil servants, promising to "throw off the political class that hates our country." Donald J. Trump, Speech at Conservative Political Action Conference (March 4, 2023), https://tinyurl.com/2hjrs5ah. As he explained, "you'll see that on the first day of my presidency, the deep state which is destroying our nation. The tables will turn and we will destroy the deep state. We're going to destroy the deep state." Donald J. Trump, Speech at South Carolina GOP Dinner (Aug. 5, 2023), https://tinyurl.com/36uhbe74.~~

~~36. President Trump has singled out Democrats and so-called "RINOs" (Republicans In Name Only) for termination. For example, in one video post from May 2023, Trump told a reporter that he will make "very big changes" to the FBI in a potential second term. Donald J. Trump (@realDonaldTrump), Truth Social (May 15, 2023, 11:04 PM ET), https://tinyurl.com/bdesuz3w. The DOJ and FBI, Trump said, personify the "deep state" as they are filled with "thousands and thousands" of "RINOs and with Democrats" that have been there for decades. Rebecca Jacobs, *Trump Has Said He Wants to Destroy the "Deep State" 56 Times On Truth Social*, CREW (Aug. 1, 2024), https://tinyurl.com/36z27phm. In another speech, he criticized the "deep state" workers who "work with the with the Democrats and the Republicans,~~

and those are the Republicans I don't like." Donald Trump, Speech at Political Rally in Sarasota, Florida (July 3, 2021), https://tinyurl.com/58r46v4a.

37. Indeed, on the same day that he issued the Executive Order, President Trump declared his desire to fire career civil servants that had been hired by the Biden Administration, stating that "[m]ost of those bureaucrats are being fired – they're gone. It should be all of them." Erich Wagner, "*Trump: Agencies Should Fire 'All' Bureaucrats*," Government Executive (Jan. 20, 2025), https://www.govexec.com/workforce/2025/01/trump-agencies-should-fire-allbureaucrats/402353/. As he signed the Executive Order, President Trump reiterated that he was "getting rid of all the cancer, the cancer caused by the Biden administration." Alan Rappeport, *"Federal Employees Union Sues Trump Over Worker Protections*," New York Times (Jan. 21, 2025), https://www.nytimes.com/2025/01/21/us/politics/trump-schedule ffederal- workers.html.

38. Vice President Vance reiterated that President Trump should "[f]ire every single midlevel bureaucrat, every civil servant in the administrative state, replace them with our people." Andrew Prokop, *J.D. Vance's Radical Plan to Build a Government of Trump Loyalists*, Vox (July 18, 2024), https://tinyurl.com/4rsvn7xv.

**The President and OPM Lack Authority to Strip Procedural Protections from Civil Servants Without Due Process**

39. The E.O. and OPM Memorandum purport to strip due process protections from current career civil servants, allowing employees placed onto renewed Schedule F to be fired at will and without procedural protections such as notice and an opportunity to be heard.

83.1. But once federal employees obtain tenure protections, they retain them—even if their positions are reclassified into positions no longer eligible for those protections, as the

Constitution prohibits the government from stripping that interest without due process of law. *See Cleveland Bd. of Educ. v. Loudermill*, 70 U.S. 532, 541 (1985); U.S. Const. amend. V.

84.1. Here, Congress created conditions under which excepted and competitive service employees with the requisite satisfactory tenure earn a property interest in that continued employment. For such employees, Congress has mandated that removal and the other actions described in title 5 may be taken only "for such cause as will promote the efficiency of the service." *See* 5 U.S.C. §§ 7503(a), 7513(a); 5 C.F.R. §§ 752.102(a), 752.202(a).

85.1. This property interest in continued employment has existed in the civil service since at least 1912, when the Lloyd-La Follette Act required just cause to remove a federal employee. *See Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 576-77 (1972); 89 Fed. Reg. at 24987.

40. The Constitution divests the president of authority to terminate employees' accrued property interests in continued employment, and their concomitant due process protections, simply by converting them from one federal civil service category to another. *See Roth v. Brownell*, 215 F.2d 500, 502 (D.C. Cir. 1954). "Neither the formula of 'excepting' the kind of position a person holds, nor any other formula, can obviate the requirements" for firing a civil servant. *Id.*

**The Executive Order and OPM Memorandum Disregard Foundational Tenets of Administrative Law and Would Require Agencies to Violate the Administrative Procedure Act**

41. The E.O. and OPM Memorandum purport to simply disregard prior legal restraints against its implementation by nullifying regulations enacted pursuant to the Administrative Procedure Act following notice and comment.

86.1. Specifically, the E.O. provides that 5 C.F.R. part 302 and 5 C.F.R. § 210.102(b)(3) and (4) "shall be held inoperative and without effect" until OPM rescinds all portions of the Final Rule which would interfere with the E.O. January 20, 2025 E.O. § 4.

42. Likewise, the OPM Memorandum directs agencies to "disregard" provisions of the OPM Rule. OPM Mem. at 4-5.

43. This circumvents Congress' requirement in the Administrative Procedure Act that rulemakings and resulting regulations be promulgated, delayed, or rescinded through procedures designed "(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005).

44. Congress expressly subjected OPM to the rulemaking requirements of the Administrative Procedure Act. *See* 5 U.S.C. §§ 553, 1103(b)(1), 1105; *see also* 5 C.F.R. § 110.101.

45. As described above, pursuant to its statutory authority, OPM previously engaged in comprehensive notice-and-comment rulemaking that implicated many issues relevant to the E.O. and ultimately issued final regulations that became effective on May 9, 2024.

46. The May 9, 2024 OPM regulations are "legislative" because they were adopted "pursuant to properly delegated authority, ha[d] the force of law, and impose[d] new rights or duties." *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018).

47. To delay or rescind a legislative rule adopted through notice-and-comment rulemaking, the government must act through notice-and-comment. *See, e.g.*, *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 235 (D.C. Cir. 1992); *Clean Air Council v. Pruitt*, 862 F.3d 1, 8-9 (D.C. Cir. 2017).

~~48. But prior to OPM completing the process to rescind and amend, "including the resolution of any judicial review," the E.O. declares that the existing regulations are nonetheless "inoperative and without effect." *Id.*~~

~~49. The E.O. thus directs agencies to disregard the procedures and protections set forth in operative regulations *now*, without abiding by the notice and comment requirements of the Administrative Procedure Act.~~

~~50. The January 2025 OPM Memorandum asserted that the E.O. "directly nullified some portions of that rule." OPM Mem. at 4. OPM directed agencies to "disregard the provisions of 5 CFR part 302, subpart F, 5 CFR 210.102(b)(3), and 5 CFR 210.102(b)(4)." *Id.*~~

~~51. The E.O., and OPM's subsequent action, thereby deprive individuals, organizations, and other interested parties – including Plaintiff – from providing OPM important perspectives and data through the notice and comment process prior to subsequent final rulemaking.~~

~~52. By directing agencies to ignore regulations even before they have been properly revoked, the E.O. also mandates that agencies violate the Administrative Procedure Act, which requires courts to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).~~

**The Challenged Actions Have ~~Already~~ Harmed ~~PEER~~Plaintiffs And Will Continue To ~~Do So~~ Harm Plaintiffs**

**Harm to PEER**

~~87.~~163. PEER's mission is to protect civil servants who protect our environment and public health. These civil servants are often whistleblowers who reveal environmental or public health abuses and other violations within their agencies and may face retaliation as a result.

~~88.~~164. Federal employees who reasonably believe they have information about illegality, fraud, waste, abuse, or other wrongdoing relating to environmental, public health, or scientific issues often come to PEER for legal advice and assistance.

~~89.~~165. PEER supports many of these whistleblowers with pro bono legal representation and strategic guidance in exercising their rights to make protected whistleblower disclosures. PEER also represents whistleblowers before the Office of Special Counsel ("OSC") and the MSPB if they face retaliation.

~~90.~~166. To advance its mission, and as part of PEER's core work, PEER produces educational resources about whistleblowing for employees considering reporting abuses, including a survival guide for public employees considering blowing the whistle. As part of PEER's mission to promote high standards of environmental ethics and scientific integrity, and to shine a light on governmental impropriety, PEER regularly publicizes information from whistleblowers regarding illegal or improper government conduct in blog posts, news articles, press releases, reports, and newsletters. It also utilizes the information in conducting its own investigations and crafting Freedom of Information Act ("FOIA") requests for records that could corroborate or supplement whistleblower disclosures to PEER.

~~53. PEER investigations prompted by federal whistleblowers have uncovered and led to reforms regarding EPA's regulation of PFAS (per- and polyfluoroalkyl substances) and other toxic chemicals, air pollution in the Front Range of Colorado, public lands grazing management, wildlife laboratory biosafety practices, the regulation of air tour overflights and electronic bicycles impacting national parks, and many other environmental and public health issues.~~

~~91.~~167. PEER's ability to perform these mission-critical functions depends on whistleblowers' willingness to share information with PEER.

92.168. When a potential client contacts PEER, PEER spends significant time taking information from the potential client, conducting initial evaluations, advising the potential client of their rights and the risks of (and protections against) retaliation, and evaluating whether PEER will represent each potential client. PEER works closely with each potential client to determine the best course of action tailored to their unique circumstances. The initial intake process can by itself take hours, even for potential clients that PEER does not ultimately represent.

54. When consulting a potential whistleblower, PEER spends significant time advising the potential client of their rights and options, as well as the risks of (and protections against) retaliation.

93.169. Since its founding in 1992, PEER has represented or assisted thousands of federal employee whistleblowers and potential whistleblowers.

94.170. Where a PEER client experiences retaliation, or where a potential client comes to PEER after being retaliated against, PEER represents federal employee whistleblowers before the MSPB and the Department of Labor, assists them with the preparation of OSC or Inspector General complaints and disclosures, and advises them on legal matters connected to their employment.

95.171. The whistleblower-retaliation protections of Chapter 23 and the corresponding OSC/MSPB procedures of Chapters 75(II) and 12 are critical to instilling confidence in whistleblowers to come forward and disclose misconduct, including to PEER. WhistleblowersIn PEER's experience, whistleblowers are willing to provide information to PEER in large part because of the CSRA's for-cause termination provisions and strong protections against retaliation. In PEER's experience, clients and potential clients want to know if they can be fired for blowing the whistle, and if so, what their rights are.

96.172. The OSC/MSPB procedures of Chapter 75(II) and Chapter 12 are critical avenues of redress that PEER has long utilized to bring claims of whistleblower retaliation to the attention of the agencies charged with protecting the merit-based civil service.

97.173. Prevailing parties in OSC/MSPB proceedings are entitled to attorney's fees, *see* 5 U.S.C. § 7701(g), 5 U.S.C. § 1214(g)(2), and settlements in such proceedings often include attorney's fees. When PEER successfully represents clients in OSC/MSPB proceedings and the client is awarded attorney's fees, PEER typically recovers those fees.

98.174. Since 2000, PEER has represented numerous employees in OSC/MSPB proceedings and recovered substantial amounts in attorneys' fees for such representation.

99.175. PEER also currently has a motion pending before the MSPB seeking approximately $300,000 in attorney's fees.

100.176. Prior to renewed Schedule FP/C, PEER routinely advised prospective federal employee whistleblowers in covered positions that they were entitled to the whistleblower protections of Chapter 23 and the corresponding procedural protections of Chapters 75(II) and 12.

101.177. PEER regularly represents and works with civil servants who are now at high risk of being reclassified under renewed Schedule FP/C. For example, about half of PEER's clients and potential clients review rulemakings, help write rules, or are otherwise involved in policy-related work, all of which are characteristics relevant to reclassification. *See* OPM Mem. at 2-3; Executive Order 13957 4; Integrated E.O. § 5(c).

102.178. Employees moved into renewed Schedule FP/C will lose the whistleblower-retaliation protections of Chapter 23 and the OSC/MSPB procedures of Chapter 75(II) and 12 that enable PEER's mission-critical work. As a result, PEER must fundamentally alter its client intake process to tell potential federal whistleblowers that, if they are moved to renewed Schedule FP/C,

they will be reclassified as at-will employees, and their agency would not need to give any reason at all for firing or disciplining them.

~~103.~~179. Without the notice and reasoned basis requirements of the CSRA, whistleblowers will be unlikely to prevail in the event of employer retaliation for their whistleblowing.

~~104.~~180. This fundamentally alters PEER's relationships with clients and its ability to work on their behalf.

~~55. Neither the Executive Order nor the OPM Memorandum clarify how any forthcoming prohibited personnel practices will apply or be enforced for employees moved to renewed Schedule F. PEER therefore cannot provide clear advice or counsel on those issues.~~

~~105.~~181. The direct and foreseeable consequence of stripping employees of protections (or otherwise weakening those protections) is to chill potential whistleblowers from reporting potential wrongdoing, directly impeding PEER's ability to carry out its mission-critical functions of representing federal employee whistleblowers and investigating and disclosing misconduct that they identify to the public.

~~106.~~182. Indeed, several of PEER's clients and potential clients have already indicated that they are reluctant to make confidential whistleblower reports or to speak to the media due to fear of retaliation given ~~renewed~~ Schedule ~~F~~P/C. For example, after the ~~Executive Order~~E.O. was issued, PEER spoke to one scientist who handles policy issues who was hesitant to provide information or even reveal his name to PEER because he feared summary termination pursuant to ~~renewed~~ Schedule ~~F~~P/C. PEER has had similar experiences with other federal employees who work at the intersection of science and policy.

~~107.~~183. As potential whistleblowers lose protections from termination—or perceive that they have lost them—fewer whistleblowers will decide to participate in filing claims before the

MSPB or other tribunals or provide PEER with information about potential government misconduct, undermining PEER's core activities of representing and supporting agency whistleblowers.

56. As potential whistleblowers lose protections from termination—or perceive that they have lost them—fewer whistleblowers will provide PEER with information about government misconduct and environmental protection, undermining PEER's core activities of publicizing such lapses through media, blog posts, articles, reports, and other avenues.

108.184. Fewer clients willing to bring whistleblower claims will also result in less attorney's fee recoveries for PEER in MSPB proceedings.

57. Separate and apart from any chilling effect on whistleblowing, reducing the overall number of federal employees with rights to pursue whistleblower retaliation claims through the OSC/MSPB process will further shrink PEER's client base and attorney's fee revenue.

109.185. Stripping PEER's client-base of OSC/MSPB procedural protections will also foreclose critical avenues of redress for impacted employees that PEER has historically utilized to bring legal violations to the attention of the agencies charged with protecting the merit-based civil service.

110.186. The uncertainty engendered by renewed Schedule FP/C will also impede PEER's ability to provide clear and accurate advice to clients and potential clients regarding their rights and options, further undermining PEER's mission.

111.187. PEER submitted a public comment during notice-and-comment rulemaking on the 2024 OPM regulations. The purported rescission of those regulations without notice and comment deprives PEER of its ability to submit comment prior to the 2024 OPM Rule—specifically, the rescission and will of 5 C.F.R. pt. 302 laying out the procedural requirements when positions were

~~moved into a new schedule—also~~ further ~~impair~~impairs PEER's mission by depriving it of critical information and procedural safeguards that would have enabled PEER to better serve employees involuntarily moved into ~~renewed~~ Schedule ~~F~~P/C.

~~58. First, the 2024 OPM regulations require agencies to publish in the Federal Register information that would give PEER notice of: agencies where whistleblowers will be particularly vulnerable (and help PEER defend its clients accordingly); the need to prepare appeals of renewed Schedule F reclassifications on behalf of clients; and potential clients in need of PEER's services.~~

~~59. Second, the 2024 OPM regulations requiring 30-days' advance notice would give PEER time to consult with clients and to appeal any such reclassification before it goes into effect and increases the likelihood that such clients will timely consult with PEER to protect their legal rights and assert those rights. See 5 C.F.R. § 302.602(c).~~

~~60. Third, the 2024 OPM regulations make clear that many reclassified employees would retain MSPB appeal rights. See 5 C.F.R. § 302.603. As noted, PEER's ability to effectively defend its clients' interests often depends on utilizing the MSPB as an avenue of redress.~~

~~112.~~188. PEER currently employs seven attorneys, who spend a large portion of their time providing pro bono legal services to federal civil servants.

~~113.~~189. In addition to providing such legal services, PEER attorneys perform myriad other functions, including: drafting rulemaking petitions and comments, administrative complaints, requests for investigation, reports, scientific papers, blog posts, press releases, and other public products; overseeing chemical testing; analyzing laboratory reports; conducting webinars; doing media interviews; submitting and tracking FOIA requests and reviewing records released in response to those requests; collaborating with other nonprofit organizations on matters of common interest; managing staff; and handling grant applications.

61. As noted above, the E.O. and OPM MemorandumDefendants' actions have already required and will continue to require PEER to expend -scarce attorney resources to alter its intake process to inform potential federal whistleblowers that, if they are moved to renewed Schedule F, they can be fired without any reason given at all, and will be unlikely to prevail – or even have a forum in which to bring a complaint – if they face retaliation for their whistleblowing.

114.190. The E.O. and OPM Memorandum have also required and will continue to require PEER attorneys to revise PEER'sand existing educational materials, and to generate new educational materials, to reflect the establishment of a new category of career federal employees and the loss of whistleblower protections for many federal employees.

115.191. The E.O. and., OPM Memorandum, and OPM Final Rule have already led to an uptick in inquiries by federal employees concerned about being reclassified under renewed Schedule FP/C. Responding to these inquiries, which is a core aspect of PEER's mission, has diverted PEER staff from engaging in other mission-critical activities.

116.192. Since the Executive Order was promulgated on January 2120, 2025, PEER has received at least 32dozens of inquiries from clients or potential clients who have identified Schedule F or renewed Schedule FP/C as the reason for their outreach. That number is increasing rapidly. These inquiries have required PEER to expend additional resources counseling and advising, both because of increased call volume and lengthier counseling sessions due to new fears and concerns related to the Executive Order. PEER expects the number of inquiries, and corresponding drain on PEER's staff hours, to continue to climb as Schedule P/C is implemented.

62. Since January 21, 2025, PEER has spent approximately 37 hours performing work for clients or potential clients in response to these concerns. That number is increasing rapidly as

PEER spends more time conducting intakes and providing legal services in connection with renewed Schedule F.

63. Since January 24, 2025, at least nine individuals reached out to PEER because they were advised by their supervisors that they were likely subject to renewed Schedule F.

117.193. While call volume and time spent counseling potential clients is increasing, thesePEER's additional efforts have not yielded more clients ultimately willing to serve as whistleblowers in furtherance of PEER's mission. For instance, of the 32 inquiries PEER has fielded since January 21, 2025 relating to renewed Schedule F, none have resulted in actionable whistleblower disclosures.

118.194. Prior to renewed Schedule FP/C, intakes more regularly led to actionable whistleblower disclosures.

64. As noted above, because of renewed Schedule F, PEER is already witnessing a chilling effect on federal employees who are scared to blow the whistle because they fear that they will be subject to termination without any civil service protections.

119.195. Because of the repeated outreach on this topic from the public and from, potential clients, and the media, PEER has devoted significant communications resources to educate civil servants and the public about renewed Schedule F'sP/C's threatened revocation of legal protections, including a resource page, webinars and trainings, and blog posts on these topics.

65. Since January 21, 2025, numerous media outlets have contacted PEER seeking comment or information related to whistleblower rights in light of the Executive Order and this number continues to rise. PEER staff have expended time responding to these inquiries.

66. Given the increase in outreach from clients and potential clients since the E.O. was issued, PEER anticipates being flooded with new client intake and counseling requests as renewed

~~Schedule F~~ As Schedule P/C is implemented, ~~specific positions are identified for reclassification, and potentially thousands of career federal employees face imminent reclassification.~~

~~120.~~196. ~~Because renewed Schedule F implicates the rights of whistleblowers—the core group with whom PEER works—and because PEER has already received numerous inquiries and questions from its constituents,~~ PEER will need to conduct additional communication and training activities in response to ~~renewed~~ Schedule ~~F~~P/C.

~~121.~~197. Responding to the increased demand for legal services and other ~~renewed~~ Schedule ~~F~~P/C-related activities has required and will require PEER attorneys and other staff to divert scarce resources from the other mission-critical tasks detailed above ~~in paragraph 42. Time spent by PEER staff on work related to renewed Schedule F would otherwise be spent on that other work~~, including intake unrelated to ~~renewed~~ Schedule ~~F~~P/C, advocacy, education, and environmental and FOIA litigation.

**Harm to AFGE, AFSCME, and AFGE Local 1923**

198. AFGE, on its own and in conjunction with its affiliated councils and locals, including Local 1923, represents federal employees in matters relating to their employment in agencies and departments across the federal government.

199. AFSCME, through AFSCME Council 20 and its constituent local unions, represents members and bargaining unit employees in agencies and departments across the federal government for which AFSCME's subordinate bodies have been certified as the exclusive representative pursuant to 5 U.S.C. § 7111.

200. AFGE, AFSCME, and their affiliates and subordinate bodies, including AFGE Local 1923, have expended and will continue to expend substantial time and resources to create guidance for members and to counsel members directly—including members who will shortly lose

exclusive representation by AFGE or AFSCME in collective bargaining due to reclassification of those members out of bargaining units—regarding Schedule P/C and its implications for individual employees' labor and employment protections. AFGE and AFSCME affiliates and their federal employee members have already reached out to AFGE, AFSCME, and Local 1923 for support in navigating the new Schedule P/C, because these members fully expect that, based on their job duties, they are likely to be moved into a Schedule P/C position, and these employees are concerned with the resulting loss of not only their civil service protections but also their coverage by a union-negotiated collective bargaining agreement (CBA).

201. Efforts to counteract the harms from the Final Rule are diverting employees and resources of AFGE, AFSCME, and AFGE Local 1923 from otherwise being used to further their mission by organizing and representing employees, negotiating with employers, and advocating for improved employment conditions.

202. Through its staff, AFGE regularly advises its affiliates on how to assist AFGE members in exercising their civil service rights under the law, including adverse action rights. AFGE members' loss of rights to challenge adverse employment actions would impede AFGE's core service of assisting with the exercise of civil service protections.

203. Additionally, the OPM Final Rule instructs each agency to develop its own internal policies to protect employees from prohibited personnel practices. AFGE represents bargaining unit employees across over 35 agencies (and Local 1923 represents bargaining units across over five), each of which may develop differing standards and procedures. Advising affiliates and members on many, potentially varying frameworks will add significant additional burdens for AFGE and Local 1923 and impede AFGE and Local 1923 from carrying out their core missions.

204. The activities of AFGE, AFSCME, and AFGE Local 1923 are funded by their respective members through voluntary membership dues, which are paid by members within union-represented collective bargaining units via deductions from those members' paychecks.

205. Regardless of whether a member voluntarily pays dues, AFGE or AFSCME serve as the exclusive collective bargaining representative (under the CSRA) of only those employees who are employed in positions within agency or department bargaining units. Certification of a union as the exclusive collective bargaining agent of a group of federal employees under the CSRA is determined on a bargaining unit-wide basis; for employees not included within a bargaining unit, there can be no exclusive collective bargaining agent.

206. AFGE's, AFSCME's, and AFGE Local 1923's federal employee members, the vast majority of whom currently are employed in positions within agency or department bargaining units, include career civil servants in positions which will be designated as Schedule P/C positions.

207. OPM intends for all Schedule P/C positions to be designated as non-bargaining unit positions. Noah Peters, a senior advisor to Kupor, told more than 200 agency HR leaders that "[a]nybody who's in one of these positions really shouldn't be in a bargaining unit—they should be management employees." Eric Katz and Erich Wagner, *Final Schedule F regulations to describe civil service protections as 'unconstitutional overcorrections,'* Gov. Exec. (Nov. 18, 2025), https://perma.cc/7NCR-9DLE; *see also* 91 Fed. Reg. at 5640 (downplaying the number of union members who will be transferred to Schedule P/C but not disputing that the Administration intends to strip them of their collective bargaining rights).

208. The E.O. provides that agencies will "expeditiously petition" the FLRA to determine whether positions classified as Schedule P/C should be excluded from bargaining units. Integrated E.O. § 5(e).

209. These proceedings will be fact-intensive and complex, and will require a substantial expenditure of union time and resources.

210. These proceedings are not subject to judicial review, further increasing the stakes and necessary expenditure of union time and resources.

211. Should these proceedings result in loss of bargaining unit status of members who presently pay AFGE (and in some cases, Local 1923) or AFSCME voluntary dues through payroll deductions, AFGE, AFSCME, and AFGE Local 1923 will lose revenue that is currently used for their operations and to further their respective missions.

212. Reclassification resulting in the loss of bargaining unit status of employees will dilute the bargaining power of AFGE, AFSCME, and Local 1923. This diminished collective strength will induce remaining members to withdraw from union membership themselves, and dissuade others from joining the union out of fear that joining the union is futile because those protections can be removed by executive fiat (i.e., placing yet additional employees in a Schedule P/C position) at any time.

213. Current AFSCME or AFGE members and other bargaining unit employees whose positions are removed from bargaining units as a result of being classified as Schedule P/C will lose the benefits of having bargaining representation and entitlement to benefits for which AFSCME or AFGE had previously bargained. They will no longer be covered by their union-negotiated CBAs, which will diminish those employees' rights in myriad significant ways, including by removing their ability to access the CBA's grievance and arbitration process to contest unlawful actions by their employing agency or department

214. AFGE and AFSCME members whose positions are classified as Schedule P/C will lose employment protections as outlined in paragraphs 108–111.

215. Current AFGE or AFSCME members who lose protections against termination, or the ability to contest unwarranted discipline or other labor rights violations under their CBA's grievance and arbitration process, as a result of their positions being reclassified as Schedule P/C will reasonably fear termination or other adverse employment action as retaliation for speech perceived as disfavored by the Administration.

216. Current AFGE or AFSCME members whose positions are not reclassified into Schedule P/C will reasonably fear reclassification as retaliation for speech perceived as disfavored by the Administration.

217. Those members will be chilled in their expression of political views in their personal capacities.

218. Those members will also be chilled in their expression of views in their official capacities–including identifying legal or other obstacles to policy implementation–which could be seen as insufficiently consistent with Administration priorities or views.

219. AFSCME also represents over one million public employees who work for state and local governments, and those employees also stand to suffer concrete injuries due to the removal of civil service protections from wide swaths of the federal government. State and local government employees interact with federal civil servants frequently and in-depth, as the government programs carried out by AFSCME members at the state and local government level are often funded, monitored, and overseen by federal government employees. If those federal employees are stripped of their civil service protections, their work will be altered and the consequences will be felt by state and local government civil servants like those represented by AFSCME around the country.

**Harms to the AFL-CIO**

220. Plaintiff AFL-CIO is directly and adversely affected by Defendants' actions and the Final Rule. The AFL-CIO's mission includes safeguarding collective bargaining protections, supporting its affiliated unions, promoting stable labor-management relations throughout the federal government, and advocating for the rights of working people.

221. Defendants' implementation of Schedule P/C has already forced and will imminently require the AFL-CIO and its affiliated unions to divert significant and quantifiable resources, including staff time, legal expertise, research capacity and policy support and representational assistance from core mission-critical functions, and toward addressing, analyzing, mitigating and responding to the consequences of the challenged regulations.

222. The AFL-CIO has been forced to expend, and will need to continue expending, resources to develop guidance, policy analysis, legal strategies, and educational materials concerning Schedule P/C for use by its affiliated unions, subordinate bodies, and represented employees. These expenditures will be amplified by the AFL-CIO's need to advise employees in the many agencies in which AFL-CIO affiliates represent employees, including the Departments of Veterans Affairs, Defense, Commerce, Transportation, and Interior, as well as the U.S. Forest Service, National Park Service, U.S. Fish and Wildlife Service, Bureau of Land Management and Bureau of Reclamation, Department of Housing and Urban Development, General Services Administration, and Environmental Protection Agency, each of which may be subject to a range of agency-specific rules and procedures. These expenditures constitute concrete injuries to the AFL-CIO's organizational interests.

223. Defendants' actions destabilize and impose structural burdens on the statutory collective bargaining framework within which AFL-CIO affiliated unions operate by undermining

long-established representational relationships and impairing affiliates' ability to carry out their core representational and advocacy functions.

224. The E.O. and OPM Final Rule create systemic instability, operational disruption and extraordinary administrative burdens that materially degrade the AFL-CIO and its affiliates' ability to effectively allocate resources, plan representational activities and execute long-term organizational initiatives.

225. Defendants' actions interfere with the AFL-CIO's associational interests by weakening the ability of represented employees to maintain collective relationships through their chosen labor organizations, including AFL-CIO affiliates, thereby frustrating the AFL-CIO's purpose of promoting collective representation and employee voice.

## CLAIMS FOR RELIEF

### Count One
### (Ultra Vires - Violation of 5 U.S.C. §§ 2302, 3302, 7511)

226. Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

~~122.~~227. Congress made the competitive service the default for civil service employees in the executive branch, as all employees are presumed part of the competitive service unless excluded. 5 U.S.C. § 2102(a)(1).

~~123.~~228. Congress has granted the president authority to exclude employees from the competitive service, only where "necessary" and warranted by "conditions of good administration." 5 U.S.C. § 3302. -The E.O. invokes this authority for establishing Schedule P/C.

~~124.~~229. The purported exceptions set forth in the Executive Order are neither necessary~~,~~ nor warranted by conditions of good administration.

125.230. Accordingly, the E.O.., and the forthcoming executive or orders reclassifying positions into Schedule P/C, cannot be justified by, and indeed violatesviolate, 5 U.S.C. § 3302 and are ultra vires.

**Count Two**
**(Ultra Vires - Violation of 5 U.S.C. §§ 2302, 7511**

67. Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

126.231. Congress intended that employees whose position is "of a confidential, policy-determining, policy-making or policy-advocating character" (," 5 U.S.C. § 7511(b)(2), 5 U.S.C. § 2302(a)(2)(B))), do not have an expectation of continued employment as they are political appointees of a particular presidential administration.

127.232. The E.O nonetheless provides: "Career positions of a confidential, policy-determining, policy-making, or policy-advocating character not normally subject to change as a result of a Presidential transition shall be listed in [Renewed Schedule F]." AmendedPolicy/Career." Integrated E.O. § 4.

128.233. Entry-level and mid-levelCareer employees will be so classified in the forthcoming executive order or orders.

129.234. The EO violatesE.O. and the forthcoming executive order or orders reclassifying positions into Schedule P/C violate 5 U.S.C. § 7511(b) and 5 U.S.C. § 2302(a)(2)(B).) and are ultra vires.

**Count Two**
**(Separation of Powers –Violation of 5 U.S.C. §§ 2302, 3302, 7511)**

235. Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

236. For the reasons explained above, the E.O. and the forthcoming executive order or orders reclassifying positions into Schedule P/C violate 5 U.S.C. § 3302, 5 U.S.C. § 7511(b), and 5 U.S.C. § 2302(a)(2)(B).

237. In flouting these provisions, the Executive Order and the forthcoming executive order or orders reclassifying positions into Schedule P/C usurp Congress's legislative authority, which the Constitution vests to Congress in Article I. *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983).

238. The President cannot usurp Congress's legislative authority by executive fiat. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) ("The President's power, if any, to issue [an executive] order must stem either from an act of Congress or from the Constitution itself."). The President has no constitutional power to enact, amend, or repeal parts of duly enacted statutes. *Clinton v. City of New York*, 524 U.S. 417, 438–39 (1998). Accordingly, the President lacks the authority to effectuate large-scale reclassifications of federal employees on his own mandate, for political or other ends that Congress did not envision.

**Count Three**
**(Administrative Procedure Act –, Contrary to Law –**
**Violation of § 706(2)(A) – 5 U.S.C. §§ 702, 706, 2302, 3302, 7511)**
**As againstAgainst Defendants EzellKupor and OPM**

130.239. Plaintiff repeatsPlaintiffs repeat and incorporatesincorporate by reference each of the foregoing allegations as if fully set forth herein.

131.240. The Administrative Procedure Act requires courts to hold unlawful and set aside any agency action "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

241. Defendants Ezell and The OPM tookFinal Rule is final agency action under the Administrative Procedure Act.

242. The OPM Final Rule invokes 5 U.S.C. § 3302 as authority for establishing Schedule P/C.

243. The purported exceptions set forth in directing agencies to act in violationthe OPM Final Rule are neither necessary nor warranted by conditions of good administration.

132.244. Congress intended that employees whose position is "of a confidential, policy-determining, policy-making or policy-advocating character," 5 U.S.C. §7511(b) and)(2), 5 U.S.C. § 2302(a)(2)(B). ), do not have an expectation of continued employment as they are political appointees of a particular presidential administration.

245. The OPM Final Rule nonetheless provides that non-political career positions will be reclassified as "positions of a confidential, policy-determining, policy-making, or policy advocating character" and placed into Schedule P/C.

133.246. Accordingly, Defendants Ezell and OPM are in violation of the OPM Final Rule, and any further OPM implementation of Schedule P/C, is contrary to 5 U.S.C. §§ 2302(a)(2)(B), 3302, and 7511(b), and therefore violates the Administrative Procedure Act. *See*, 5 U.S.C. §§ 702,§ 706(2)(A), (C), 2302(a)(2)(B), 7511(b). ).

68. As a result of Defendants Ezell's and OPM's actions, Plaintiff has suffered and continues to suffer injury.

**Count Four**
**(Ultra ViresFifth Amendment – Due Process)**

134.247. Plaintiff repeatsPlaintiffs repeat and incorporatesincorporate by reference each of the foregoing allegations as if fully set forth herein.

135.248. Congress has vested federal career civil servants with the requisite tenure with property interests in, and due process protections for, that continued employment.

~~136.~~249. The Fifth Amendment's Due Process Clause provides that the government may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural protections.

~~137.~~250. The Constitution does not give the president or OPM authority to unilaterally strip these vested rights without due process of law.

~~69. By purporting to do just that, the Executive Order was issued without legal authority and is *ultra vires.*~~

251. By purporting to do just that, the E.O. and the OPM Final Rule violate the Fifth Amendment to the United States Constitution. The forthcoming executive order or orders reclassifying positions into Schedule P/C will be derivative of the E.O. and will also violate the Fifth Amendment, as will any further OPM implementation of Schedule P/C.

**Count Five**

(~~**Ultra Vires - Violation of 5 U.S.C. §§ 553, 1103, 1105)**~~

~~70. Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.~~

~~71. As the Executive Order acknowledges, OPM must engage in rulemaking to rescind or amend existing regulations, including those promulgated by OPM in its 2024 Final Rule, "Upholding Civil Service Protections and Merit System Principles."~~

**~~Defendants lack authority to circumvent the notice-and-comment rulemaking provisions of the~~ Administrative Procedure Act ~~by unilaterally providing that existing regulations are "inoperative and without effect."~~, Contrary to Constitutional Right –**

~~72. By purporting to bypass Congress' requirements for reasoned agency rulemaking, the Executive Order violates 5 U.S.C. §§ 553, 1103, 1105.~~

**~~Count Six~~**
**~~(Administrative Procedure Act –~~ Violation of ~~5 U.S.C. §§ 553, 1103, 1105~~§ 706(2)(B) – Fifth Amendment)**
**As ~~against~~Against Defendants ~~Ezell~~Kupor and OPM**

~~138.~~252. ~~Plaintiff repeats~~Plaintiffs repeat and ~~incorporates~~incorporate by reference each of the foregoing allegations as if fully set forth herein.

253. The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

254. For the same reasons that the OPM Final Rule violates the Fifth Amendment to the U.S. Constitution, it also is contrary to constitutional rights in violation of the Administrative Procedure Act. The same is true of any further OPM implementation of Schedule P/C.

**Count Six**
**(Administrative Procedure Act, Arbitrary and Capricious – Violation of § 706(2)(A))**
**As Against Defendants Kupor and OPM**

255. Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

~~139.~~256. The Administrative Procedure Act requires courts to hold unlawful and set aside any agency action ~~taken "without observance~~found to be "arbitrary, capricious, an abuse of

procedure required bydiscretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(D).A)

73. The Act requires agencies to follow public notice and comment rulemaking procedures before rescinding, delaying, or amending regulations. *See* 5 U.S.C. § 553(b), (c).

74. Defendants Ezell and OPM failed to provide notice and an opportunity for public comment prior to taking final agency action regarding OPM's 2024 regulations inoperative and without effect.

75. Accordingly, Defendants Ezell and OPM are in violation of the Administrative Procedure Act. *See* 5 U.S.C. §§ 706(2)(D); 553, 1103, 1105.

76. As a result of Defendants Ezell's and OPM's actions, Plaintiff has suffered and continues to suffer injury.

257. The Final Rule is arbitrary and capricious for many reasons, including but not limited to: it is not supported by the record, it does not engage in reasoned decision-making, it fails to take into account reliance interests, it relies on information not in the record, it does not adequately respond to public comments, and it does not adequately justify a change in position from the 2024 OPM Rule and prior practice.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff requestsPlaintiffs request that this Court:

A. Declare that the Executive Order is not justified by and contrary to 5 U.S.C. § 3302 and in violation of 5 U.S.C. §7511(b) and 5 U.S.C. § 2302(a)(2)(B) and therefore the forthcoming executive order or orders that reclassify positions into Schedule P/C are ultra vires and null and void;

A. Declare that the Executive Order is contrary to because they exceed the President's authority under and are contrary to the civil service laws, violate the constitutional separation of powers, and violate the Fifth Amendment to the United StatesU.S. Constitution;

B. Declare that the OPM Final Rule is contrary to law, contrary to constitutional right, and arbitrary and therefore *ultra vires* and null and void, and that civil servants with accrued status and due process rights retain those rights if they are involuntarily moved between Schedules;

C. Declare that the Executive Order improperly nullifies regulationscapricious, in violation of 5 U.S.C. §§ 553, 1103, 1105 and therefore *ultra vires* and null and void;

A.B. Declare that the Executive Order instructs agencies to act in a way that violates the Administrative Procedure Act;

D. Declare that Defendant Charles Ezell and Defendant Office of Personnel Management have violated the Administrative Procedure Act by (1) directing agencies to act in violation of 5 U.S.C. §7511(b) and 5 U.S.C. § 2302(a)(2)(B) and (2) failing to provide notice and an opportunity for public comment prior to taking final agency action regarding OPM's 2024 regulations inoperative and without effect;

C. Preliminarily and permanently enjoin Defendant Charles EzellScott Kupor, Defendant Office of Personnel Management, and their agents and successors, from (1) implementing or otherwise giving effect to the Executive Order; and (2) failing to enforce and implement 5 C.F.R. part 302, subpart F, 5 C.F.R. 210.102(b)(3), and 5 C.F.R. 210.102(b)(4) unless and until they are rescinded after providing notice and the opportunity for comment in compliance with or OPM Final Rule;

B.D. Stay the Administrative Procedure ActOPM Final Rule and issue all other necessary and appropriate process to preserve status or rights under 5 U.S.C. § 705;

C.E. Vacate and set aside the January 27, 2025 OPM MemorandumOPM Final Rule and any and all actions taken pursuant to it;

D.F. Award Plaintiff itsPlaintiffs their costs, attorneys' fees, and other disbursements for this action; and

E.G. Grant any other relief this Court deems appropriate.

Dated: March 12, 20254, 2026

Respectfully Submitted,

s/ Mark B. Samburg

Mark B. Samburg (Bar No. 31090)
Kevin E. Elena Goldstein*
Friedl (Bar No. 31574)
Michael Martinez*
Kevin E. Friedl* (Admitted only in New York; practice supervised by D.C. Bar members)
Victoria S. Nugent (Bar No. 1503931553)
Webb Lyons**
Joel McElvain (Bar No. 31673)
Elena Goldstein (Bar No. 31738)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
Fax: (202) 796-4426
msamburg@democracyforward.org

kfriedl@democracyforward.org
mmartinez@democracyforward.org
wlyons@c.democracyforward.org+
jmcelvain@democracyforward.org
egoldstein@democracyforward.org
mmartinez@democracyforward.org
kfriedl@democracyforward.org
vnugent@democracyforward.org

Jonathan Weissglass*
LAW OFFICE OF JONATHAN WEISSGLASS
1939 Harrison St., Suite 150-B
Oakland, CA 94612
Telephone: (510) 836-4200
jonathan@weissglass.com

Donald K. Sherman*
Nikhel S. Sus* (Bar No. 31761)
Jonathan E. Maier*
Lauren Bingham*
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, D.C. 20044
Telephone: (202) 408-5565
Fax: (202) 588-5020
dsherman@citizensforethics.org
nsus@citizensforethics.org
jmaier@citizensforethics.org
lbingham@citizensforethics.org

*Counsel for Plaintiffs*

Laura Dumais (Bar No. 31549)
PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY
962 Wayne Ave., Suite 610
Silver Spring, MD 20910
Tel: (202) 265-7337
ldumais@peer.org

*Counsel for Plaintiff Public Employees for Environmental Responsibility*

Teague P. Paterson***

Matthew S. Blumin (Bar No. 31774)
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street N.W.
Washington, DC 20036
Telephone: (202) 775-5900
tpaterson@afscme.org
mblumin@afscme.org

*Counsel for American Federation of State, County and Municipal Employees, AFL-CIO (AFSCME)*

Rushab B. Sanghvi (Bar No. 30443)
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street N.W.
Washington, DC 20001
Telephone: (202) 639-6426
sanghr@aghe.org

*Counsel for American Federation of Government Employees, AFL-CIO (AFGE)*

Matthew Ginsburg****
AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS (AFL-CIO)
815 Sixteenth Street NW
Washington, DC 20006
Telephone: (202) 637-5397
mginsburg@aflcio.org

*Counsel for American Federation of Labor and Congress of Industrial Organizations (AFL-CIO)*

*Admitted *pro hac vice*

***Pro hac vice* motion forthcoming
***Application for admission pending
****Admission approved, pending admission ceremony